**Tania Michelle WISNER, Plaintiff,**

v.

**UNISYS CORPORATION, Successor to Burroughs Corporation; and Applied Digital Data Systems, a Subsidiary of NCR Corporation, Defendants.**

No. 94–1380–PFK.

United States District Court,
D. Kansas.

Feb. 20, 1996.

As Amended Feb. 26, 1996.

1502

Arnold C. Lakind, of Szaferman, Lakind, Blumstein, Watter & Blader, P.C., Lawrenceville, NJ, Steven Phillips, of Levy, Phillips & Konigsberg, New York City, Albert L. Kamas and Johnie C. Frank, of Render, Kamas & Hammond, Wichita, KS, for Plaintiff.

Porzio, Bromberg & Newman, Morristown, NJ, McKenna & Cuneo, Washington, DC, Alvin D. Herrington, Sharon A. Werner, and M. Kathryn Webb, of McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, KS, for Defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, Senior District Judge.

In the present action, the plaintiff was allegedly injured as the result of her opera-

tion of a United States Postal Service multiple position letter sorting machine, or MPLSM, manufactured by Burroughs Corporation. Unisys, the defendant and successor in interest to Burroughs, has filed a motion for summary judgment predicated on the government contractor defense. The court has carefully reviewed the briefs submitted by the parties and concludes that oral argument will not materially assist in the just resolution of the issues presented. The court will therefore proceed directly to a ruling on Unisys' motion.

■ Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

■ In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'"

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita* ). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ Local Rule 56.1 provides that a party opposing a motion may submit a factual statement, but also requires that the opponent directly engage the statement of uncontroverted facts asserted by the movant. The rule does not permit blanket, indiscriminate denials of a movant's asserted facts:

> Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, *shall state the number of movant's fact that is disputed.* All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of statement of the summary judgment *unless specifically controverted* by the statement of the opposing party.

D.Kan.Rule 56.1 (emphasis added). The court would note that a response such as that filed by counsel for plaintiff, which sets forth 17 independent statements of fact, coupled with a blanket denial of movant Unisys' statements of fact "insofar as they are inconsistent" with the plaintiff's factual statements, does not conform to the letter or spirit of Rule 56.1. Having reviewed all of the materials submitted by the parties, the court finds that there is no material dispute as to the key facts in the present action.

The 77-foot long and 9-foot high MPLSM consists of 12 consoles where postal operators use two 10-key, piano-style keyboards arranged in two tiers. Operators read zip codes from mail conveyed along the MPLSM and input codes through their keyboards; the MPLSM then directs the mail into an appropriate bin for collection and distribution. Appendix A, attached hereto and taken from the Postal Service's Engineering Hand-

book for the MPLSM, shows a console operator side view of the Model 120 machine. (Def's. Ex. 4B at 1.2.)

The Postal Service began the development and design of the MPLSM in 1956, through a National Bureau of Standards contract with Rabinow Engineering Company. Rabinow created design and engineering drawings which it supplied to the Postal Service, and further designed and built a full-scale model which was installed at the United States Postal Laboratory in Washington, D.C. This model was then subjected to extensive testing by Postal Service engineers and human factor specialists. The Postal Service also reviewed in detail Rabinow's engineering drawings to determine compliance with Postal Service requirements. As a result of this testing, the Postal Service made several modifications to the design, including noise reduction and changing the position of the keyboard to allow more convenient operator access.

In 1958, the Postal Service awarded a cost-plus research and development contract to Burroughs to build 10 MPLSM prototypes. These MPLSMs did not permit any fundamental change in the Rabinow design. To perform the contract, Postal Service gave Burroughs the Rabinow design drawings as well as "rigid postal specifications," including those for the design of the MPLSM keyboard. Any design changes in the MPLSM were to be done only at the direction of the Postal Service.

The Postal Service and Burroughs personnel, including human factors specialists, met extensively to discuss improvements in the Rabinow model and engaged in an active "back-and-forth" exchange of information and ideas. Burroughs engineers also visited the Postal Service Laboratory to exchange technical ideas and concepts.

The completed Burroughs prototypes were first installed in 1959 in post offices in Flint and Detroit, Michigan and in Washington, D.C. Postal Service personnel inspected each of the prototypes to determine compliance with criteria developed by the laboratory and the Postal Service's human factors engineers. If a prototype did not meet these criteria, corrections were made and the machines were reevaluated. The Postal Service eventually accepted all 10 prototypes as conforming in all material respects to applicable requirements.

After four years of review and evaluation, including human factors analyses, the Postal Service developed and drafted a comprehensive set of detailed production drawings and specifications for the MPLSM in 1963. These included keyboard and speed control specifications which detailed every aspect of the design and materials of the keyboard, its shape, tension, triggering pressure, stroke distance, key spacing, actuating pressure, and range of operating speeds.

The first MPLSM production contract was awarded to Burroughs in 1964 for the manufacture of 26 machines, pursuant to Postal Service "build to print" detailed drawings and specifications. These machines were designated Model 120/121. Postal Service required production "strictly in accordance" with its specifications (Def.s Ex. 5A at 3–25), which included requirements for the Model 120/121 consoles and keyboards, and the console dimensions and components; the nature of the operator's chair; the rate of letter sorting; and the shape, configuration, spacing, tension, materials, and stroke distance of the keys.

Deviations "in the slightest detail" from the specifications required Postal Service approval. (Specification 3.14, Def.s Ex. 5A at 3–30.) The specifications also incorporated numerous federal, national, and military standards and specifications. The lower right-hand corner of each MPLSM drawing included a Postal Service nameplate or logo. The specifications required Burroughs to provide those safety items provided for by the Postal Service, but prohibited Burroughs from adding warnings, markings or labels without Postal Service approval.

To ensure compliance with its specifications, the Postal Service conducted a first article test on the first manufactured Model 120/121, which involved a detailed physical and functional examination. The test was a success and the Postal Service authorized Burroughs to commence production.

During the course of production, the Postal Service and its on-site representative, the Defense Contractor Administrative Service (DCAS), conducted detailed inspections. The DCAS reviewed Burroughs' tests and inspections, as well as conducting its own inspections of individual parts, subassemblies, and manufacturing techniques. When DCAS or the Postal Service determined a part did not comply with specifications, Burroughs corrected the nonconformity subject to further DCAS review and approval.

At the end of the production line, DCAS certified that the subassemblies were ready for shipment. After shipping to post offices around the country, Burroughs technicians assembled and installed the MPLSMs pursuant to Postal Service layout drawings. A Postal Service representative was usually present as each machine was assembled.

Upon assembly of the machines, the Postal Service conducted a "live mail" test to verify that the machines worked as intended. If any problems were discovered, Burroughs made corrections following discussions between the Postal Service and Burroughs, and another live mail test was performed. After the completion of these tests, an exit conference was held where the Postal Service certified that the machine had been tested and it conformed in all material respects to its requirements.

Once the machines were accepted, Burroughs could not and did not supervise their operation. The Postal Service, not Burroughs, was responsible for training the machine operators. The Postal Service did require Burroughs to submit monthly progress reports and attend monthly reviews to discuss production, design, and safety issues.

In 1966, the Postal Service awarded Burroughs a second contract to make 50 MPLSMs. Over the next 20 years, the Postal Service awarded a series of fixed-price, competitive bid contracts to manufacture over 900 MPLSMs. All of these contracts involved bids based on "build-to-print" drawings and specifications of the Postal Service, which included requirements for the machine keyboards and consoles, their sorting rates, and characteristics of the operator chair. As before, the Postal Service required strict compliance with its specifications. And, as before, the Postal Service tested and inspected machines throughout the manufacture and delivery process.

The Postal Service also remained responsible for the training of MPLSM operators. The 1968 training manual prepared by the Postal Service's Bureau of Operations provides that an operator "must key numbers with a firm decisive downward thrust of his fingers." The manual provides that an operator should sit erect and "[h]old arms parallel to floor; wrist fairly stiff; fingers curved above the keys." (Def.'s Ex. 17.)

In 1970, the Postal Service entered into a contract with GATX Corporation to modify certain aspects of the MPLSM. GATX designed and built a zip mail translator (ZMT) to be retrofitted into Model 120/121 MPLSMs. In order to accommodate the Postal Service's shift from chordal keying of memorized codes to sequential keying of zip code information, the ZMT added an auxiliary 10–key keyboard above the old MPLSM keyboard. While Burroughs installed some ZMT kits onto existing MPLSMs, it did not participate in any way in the design of the ZMT system.

In 1974, the Postal Service awarded Burroughs a contract to manufacture 150 Model 140/141 MPLSMs. The 140/141 Model is distinguished from the earlier 120/121 by its incorporation of the ZMT system. In addition, the new model was made of 18 modules or sections for easier shipping and installation. The Postal Service directed that the two models be functionally identical in all other material respects.

The contract required Burroughs to redraft the drawings for the old model so as to incorporate the ZMT system and modularization. No other changes in the design of the MPLSM were permitted, including the addition of warnings, markings, or labels, without prior Postal Service approval. During the 18–month preproduction phase for the new machine, the Postal Service held regular program reviews to discuss design concepts and program status. These reviews involved participants from several engineering disciplines, including mechanical, electrical, hu-

man factors, quality assurance, and training. Burroughs was not allowed to enter production until each drawing had been reviewed and approved by the Postal Service project management, quality assurance, and engineering departments.

The Postal Service designed the expanded zip retrofit (EZR) system in 1979, an electronic modification which replaced the retrofitted ZMTs and allowed the use of a nine-digit zip code in sorting mail, but it did not alter the MPLSM console or keyboard. In 1980, the Postal Service awarded Burroughs a contract to develop production versions of the EZR and produce production drawings, following a prototype designed by the Postal Service. The contract provided that Burroughs was not to deviate from Postal Service drawings without permission. Further, the Postal Service and Burroughs held periodic design reviews to assess the program's status and engage in a back-and-forth dialogue.

After the Postal Service approved Burroughs' EZR production drawings, it conducted a first article test of the system which involved a detailed physical and functional inspection to ensure compliance with Postal Service specifications. After successful completion of this test, the Postal Service authorized Burroughs to begin production. Burroughs was not permitted to make any unilateral changes in the EZR system.

As with the earlier production contracts, the Postal Service conducted on-site, in-process, and subassembly inspections. Following the live mail test, the Postal Service ultimately accepted every EZR system as conforming in all material respects to its requirements.

The Postal Service awarded Burroughs two additional EZR contracts. Under each contract, the Postal Service gave Burroughs detailed production drawings and specifications, and DCAS performed in-process and subassembly inspections. Each contract also required a first article test prior to production. As with the first EZR contract, the Postal Service ultimately accepted each EZR system retrofitted on existing MPLSMs as conforming in all material respects to its requirements.

The Postal Service has studied and evaluated human factors aspects of MPLSM operations since the mid to late 1950s. In its Washington laboratory, the Postal Service has installed keyboards into MPLSM consoles and assigned human factors engineers to study the interaction between operator and machine. The Postal Service also evaluated consoles and keyboards over a four-year period following installation of the first prototypes. In addition, the Postal Service during this time was aware of the human factors work performed by Lawrence H. Wilson Associates, a Burroughs subcontractor.

In the early 1960s, citing a need for "human engineering of operator work stations, including operator keyboards," the Postal Service expanded its in-house human factors capabilities to include the investigation of human factors in keyboards and codes, as well as letter sorting rates. It also established a human factors laboratory to study human engineering in postal mechanization and created a "Human Factors Research and Development Five–Year Plan," which focused, in part, on developing work-space and keyboard design standards, and on addressing fatigue reduction, keyboard design, and operator versus machine pacing of MPLSM work. The Postal Service also issued a list of criteria for using the MPLSMs that included a discussion of hand and arm fatigue in keyboard operations and the use of adjustable chairs with arm rests.

The Postal Service authored or received several studies addressing human engineering and MPLSM keyboard designs during the 1960s. By 1967, with 55 MPLSMs in operation around the country, the Postal Service recognized an "immediate" need to perform in-house "human engineering studies on operator work stations, including operator keyboards."

By 1970, the United Federation of Postal Clerks was aware that:

In some cases operators have developed, after years of operating, an arthritic condition in their wrists attributable to sustained suspension of their hands above the keyboard. On doctor's advice they were

forced to leave the machine. An arm rest would seem to be appropriate.

(Def.s Ex. 25.)

During the 1970s, the Postal Service issued or obtained several reports which included assessments of human engineering issues involved in MPLSM keyboard operations. These reports addressed numerous issues, including optimum key pressure, keyboard configuration, proper seating and keying positions, work-rest cycles, operator fatigue, and availability of arm and foot rests. In 1976, citing a long-standing "need to locate, list and describe the work done in solving human factors problems in postal operations," the Postal Service prepared an annotated bibliography of human factors reports, documents, and related publications. This work, containing citations back to 1956, lists nearly 100 human factors reports prepared either by or for the Postal Service, many of which relate to the MPLSM. This bibliography was updated in 1979.

In 1976, the postal workers' union and the National Institute of Occupational Safety and Health undertook a long-term study of job-related health concerns involving the MPLSM, including the effect of keying on machine operators. As a part of this study, a survey was conducted which produced a number of complaints, including those from MPLSM operators of stiff or sore wrists, loss of feeling in fingers and wrists, cramps in fingers, and loss of arm and hand strength. The results of this study were reported in 1981 at the American Industrial Hygiene Conference.

During the 1980s, the Postal Service authored or received numerous other studies addressing cumulative trauma and its association with the MPLSM, and it examined MPLSM operators for muscular pain. Congress held hearings on alleged repetitive stress injuries among postal workers, including MPLSM operators, in 1984. In 1982, the Postal Service began to file occupational claims resulting from the operation of MPLSMs, and began to undertake modifications, including a simplification of the keying process, noise reduction, strength exercises

for operators' hands and wrists, and an employee education program. The testimony of Dr. Margit Bleecker of Johns Hopkins Medical Institution addressed the actions of the Postal Service:

> I think it should be made quite clear at this time, also, that there are no good prevalence or incidence of studies of carpal tunnel syndrome, particularly in the occupational setting. If one reviews the literature, we only have some indirect information that has come as a tangential piece of information from studies that were being done looking at other problems.

(Def.s Memo. at ¶ 86.)

Burroughs did not conduct any training programs for MPLSM operators. The Postal Service trained and supervised its MPLSM operators and addressed human factors issues in the course of that training.

Throughout its performance of the MPLSM contracts, Burroughs provided the Postal Service any information it had regarding human factors issues. Under the 1966 and 1974 contracts, Burroughs either suggested or investigated alterations to the keyboard and console to address human factors issues: in 1966, it proposed adjusting the height of the keyboard and incorporating an adjustable "heel of hand" rest in front of the keys to "help in reducing operator fatigue;" in 1974, it investigated an asynchronous keyboard console to allow operators to control the sorting rate. On other occasions, Burroughs suggested replacing the Rabinow-style keyboard with an "operator placeable," or movable, 10–key keyboard and installing a "solid state" keyboard. The Postal Service evaluated and rejected all of these proposals.

Burroughs complied with Postal Service MPLSM specifications. During the contracting period, Burroughs did not know of any connection between operation of the MPLSM and repetitive stress injuries.

 The present motion for summary judgment by Unisys rests upon the government contractor defense which forms part of the federal common law.[1] The defense, when

---

1. The court notes that this issue has recently been addressed in another action involving repet- itive stress injuries allegedly arising from use of an MPLSM. In *McCoy v. Unisys Corp.,* Case No.

applicable, serves to displace state tort law which endangers or presents a significant conflict with federal interests. *Boyle v. United Technologies,* 487 U.S. 500, 505–06, 108 S.Ct. 2510, 2514–15, 101 L.Ed.2d 442 (1988). In *Boyle,* the Supreme Court discussed the history of the defense and held that it served to bar an action arising from the crash of a Marine Corps helicopter. The contractor defense applies, under *Boyle,* when

> (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 512, 108 S.Ct. at 2518.

▇▇▇▇ As a preliminary matter, Wisner argues that *Boyle* has no application to non-military contracts. The court finds that this approach would apply the government contractor defense too narrowly. It is true that the Supreme Court in *Boyle* happened to apply the defense in the context of a claim against a military contractor, and accordingly much of the language of the opinion focuses on the federal government's interest in ensuring an efficient military. Yet there is language in *Boyle* which also points unmistakably to application to nonmilitary contracts. Thus, the Court states that the genesis of the contractor defense lies in "the Federal Government's interest in the procurement of equipment." *Id.* at 506, 108 S.Ct. at 2515. In addition, after discussing the federal government's interest in the performance of its contracts, the Court stated:

> "The present case involves an independent contractor performing its obligation under a procurement contract, rather than an official performing his duty as a federal employee, but there is obviously implicated the same interest in getting the Government's work done."

*Id.* at 505, 108 S.Ct. at 2515 (footnote omitted). Permitting the imposition of liability

under state law may imperil those federal interests:

> The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected.

*Id.* at 507, 108 S.Ct. at 2515–16. None of these concerns identified by the Court is explicitly or implicitly restricted to contracts issued by the armed forces.

▇▇▇▇ More importantly, the nature of the underlying test adopted in *Boyle* for determining whether a "significant conflict" exists between state law and the federal procurement interest inherently contradicts the suggestion that the defense is available only to military contractors. The Court explicitly concluded that the contractor defense was not grounded in the doctrine announced in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), which limits liability for injuries to military personnel. 487 U.S. at 510, 108 S.Ct. at 2517–18. Rather, the court concluded that the defense arises within the context of the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 1346(b). *See* 487 U.S. at 511, 108 S.Ct. at 2518. This exception, of course, by its explicit terms, is not limited to claims arising as a result of actions by the military, but applies to any actions requiring the exercise of discretion by "a federal agency or an employee of the Government." 28 U.S.C. § 2680(a). Indeed, the discretionary function exception has been applied directly in cases involving decisions by Postal Service authorities. *See, e.g., Fazi v. United States,* 935 F.2d 535 (2d Cir.1991); *Jurzec v. American Motors,* 856 F.2d 1116 (8th Cir.1988); *Ford v. American Motors,* 770 F.2d 465 (5th Cir.1985).

▇▇▇ Accordingly, this court finds that the government contractor defense is not restricted to military contracts. *See Carley v. Wheeled Coach,* 991 F.2d 1117 (3d Cir.1991),

H–95–1487 (S.D.Tex. Jan. 16, 1996), the court concluded that the government contractor de-

fense barred the plaintiff's claims.

*cert. denied,* —— U.S. ——, 114 S.Ct. 191, 126 L.Ed.2d 150 (1993); *Boruski v. United States,* 803 F.2d 1421 (7th Cir.1986); *Burgess v. Colorado Serum Co.,* 772 F.2d 844 (11th Cir.1985); ,*McCoy v. Unisys Corp.,* Case No. H–95–1487, Slip op. at 13 (S.D.Tex. Jan. 16, 1996); *Guillory v. Ree's Contract Service,* 872 F.Supp. 344 (S.D.Miss.1994); *Richland–Lexington Airport Dist. v. Atlas Properties,* 854 F.Supp. 400 (D.S.C.1994); *Lamb v. Martin Marietta Energy Sys.,* 835 F.Supp. 959 (W.D.Ky.1993); *Johnson v. Grumman Corp.,* 806 F.Supp. 212 (W.D.Wis.1992). *But see In re Joint Eastern & Southern Dist. N.Y. Asbestos Litig.,* 897 F.2d 626 (2d Cir.1990); *Nielsen v. George Diamond Vogel Paint Co.,* 892 F.2d 1450 (9th Cir.1990).[2] As the Eleventh Circuit stated in the pre-*Boyle* case of *Burgess,* although the government contractor defense "has become a favorite shield of military contractors," the sovereign immunity rationale underlying the defense means that the defense is not limited to military contractors: "If a contractor has acted in the sovereign's stead and can prove the elements of the defense, then he should not be denied the extension of sovereign immunity that is the government contractor defense." *Burgess,* 772 F.2d at 846.

■ In the present case, the plaintiff was allegedly injured through the use of a machine designed under the authority of, and purchased by, the United States Postal Service. The machine was designed to further the basic purpose of the Postal Service, i.e., carrying the federal mails. The "protect[ion of] mail revenues while at the same time facilitating the secure and efficient delivery of the mails" is a legitimate and important goal of the federal government. *See United States Postal Service v. Greenburg Civic Ass'ns,* 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981) (upholding statute restricting access to letter boxes against First Amendment challenge). The postal power created by Article I, Section 8 of the United States Constitution has been held to vest in Congress the power to enact "all measures necessary to secure [the mail's] safe and speedy transit, and the prompt delivery of its contents." *Ex parte Jackson,* 96 U.S. 727, 732, 24 L.Ed. 877 (1878). There can be no substantial argument that Postal Service authorities, in designing and planning the machines to quickly sort the immense amounts of mail assigned to the service, were not exercising a balance of technical, engineering, and public policy considerations. Because the rationale for the government contractor defense in securing important government interests from significant conflicts with state law is implicated here, the court finds that Unisys, as the successor to the machine's manufacturer, is entitled to assert the government contractor defense—so long as it meets the threefold test established in *Boyle.*

■ The plaintiff in the present action makes no argument that the second element of that test is not met; it is conceded that the MPLSMs manufactured by Burroughs do comply with Postal Service specifications. The plaintiff argues that the Postal Service specifications governing the keyboard console were not reasonably precise, and that Burroughs failed to fully inform the government of known dangers associated with the MPLSM. The court must reject both of plaintiff's arguments in light of the uncontroverted facts before the court.

Those facts establish that the Postal Service managed the planning and design of the MPLSM with virtually microscopic precision. The defendant has introduced facts which establish that the design requirements for the MPLSM were comprehensive, including the various defects associated with the console and keyboard asserted by the plaintiff.

For example, Specification 3.10.1.6 provides that each MPLSM console should have two keyboards, both of which

---

**2.** The Tenth Circuit has addressed the issue of the government contractor defense in the context of a military procurement contract in *Ellis v. Consolidated Diesel Elec.,* 894 F.2d 371 (10th Cir.1990), but has not addressed the issue of the application of the defense in civilian contracts. This court addressed the various potential rationales for the defense in *Johnston v. United States,* 568 F.Supp. 351, 356–58 (D.Kan.1983), a discussion which occurred five years prior to, and accordingly is modified by, the Supreme Court's decision in *Boyle,* which clearly identified the sovereign immunity rationale for the defense.

shall be binary decimal type arranged for two-hand operation having two groups of five keys, and shall be provided as part of the console by the contractor. All keys shall be unmarked, with a smooth concave surface except the two center keys in the lower group which shall be longer and have more depth to index the thumb of the each hand and simplify the touch system of the keyboard.

(Def.s Ex. 5A at 3–9.) Other specifications govern key pressure adjustments (3.10.1.6) and chair and operator posture (3.10.1.10).

The former chief of the Postal Service Laboratory has testified that these specifications governed the keyboard's design, speed of operation and materials, as well as key shapes, tension, and triggering pressure. The former assistant director of the Postal Service Office of Research and Development has characterized the service's drawings and specifications for the MPLSM as "comprehensive."

Not counting the engineering drawings associated with the MPLSM, the specifications for the machine comprise 50 single-spaced pages of text. The defendant has also submitted a copy of an engineering drawing of the MPLSM keyboard, showing its intended design and component parts. (Def.s Ex. 4A.) Wisner attacks the use of this drawing in her response by claiming it is illegible, which is only partly true—the drawing is sufficiently clear to reveal itself as a "MACHINE ELECTRICAL SCHEMATIC" for "Model No—120 121" MPLSM keyboard. More importantly, the detailed nature of the drawing supports the affidavit testimony of the postal authorities that the specifications for the MPLSM were exacting.

In her response (Pltf.'s Memo. at 14), the plaintiff cites the observation made by the Supreme Court in *Boyle* limiting the application of the rule identified therein, where, for example, the government contracts for "an air-conditioning unit, specifying the cooling capacity but not the precise manner of con-

struction." 487 U.S. at 509.[3] That illustration, however, supports an award of summary judgment in the present action. Here, the Postal Service did not merely contract with Burroughs to supply a mail sorting machine with a stated capacity, leaving the contractor free to chose the design of the machine. The Postal Service first contracted with a third party to design and construct a sorting machine. After testing the first model, the Postal Service contracted with Burroughs to manufacture machines in strict compliance with detailed plans and specifications provided and approved by the Postal Service.

The court also finds that Burroughs did not withhold information of known defects from the Postal Service. The plaintiff has failed to controvert the evidence submitted by Unisys that Burroughs had no information on dangers associated with the MPLSM which were not also known to the Postal Service. In her response, the plaintiff presents affidavit testimony reflecting that Burroughs had some information associating use of the MPLSM with occupational injuries. But there is no evidence that the Postal Service was not supplied this information.

To the contrary, the plaintiff concedes that "the Postal Service may have been aware that use of MPLSMs causes a variety of symptoms." (Pltf.'s Memo. at 18.) This, in fact, rather understates the situation, since the uncontroverted facts establish that the Postal Service, which had exclusive authority over the use of the MPLSMs and the employment and training of its operators, was in a markedly superior position to monitor the effects of use of the machine, and was, in fact, in possession of at least as much information on the dangers of MPLSM use as Burroughs.

Finally, Wisner argues that even if Unisys falls within the scope of the government contractor defense, the defense does

---

**3.** The Supreme Court's illustration is also relevant to the plaintiff's argument that *Boyle* should be limited to military contracts. The illustration carries the implication that the contractor might be entitled to the contractor defense if the government had specified the "precise manner of construction" as well as the cooling capacity. But an air conditioner is hardly a military instrument, and such an illustration would hardly be appropriate if the contractor defense were in any event to be limited to contracts for the procurement of military equipment.

not affect her claim of failure to warn. The court cannot agree. First, the Supreme Court's opinion in *Boyle* explicitly restricts the contractor's liability to instances of failing to warn of *known* dangers. 487 U.S. at 512, 108 S.Ct. at 2518–19. To the extent that the plaintiff seeks to impose liability for failure to warn under general principles of tort law which go beyond failing to warn of known dangers, her claim must be dismissed as directly contrary to law as stated in *Boyle*. *See Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir.1995).

In addition, the court finds that, in any event, the specifications issued by the Postal Service effectively precluded Burroughs from the unilateral addition of warnings to the MPLSM. Specification 3.11.7.12 provides: "All special safety devices ... for protection of operators ... shall be provided as specified herein, or as shown on the drawings." (Def.s Ex. 5A at 3–23.) The specifications also permit "[n]o deviations" from the engineering drawings without prior Postal Service approval. (Def.s Ex. 6A at 2.) The Postal Service's former assistant director of research and development has stated that Burroughs was prohibited from making "any unilateral changes to the MPLSM, including the addition of warnings, markings or labels," without prior Postal Service approval. (Def.s Ex. 4 at ¶ 9.)

The uncontroverted facts establish that under the MPLSM procurement regime established by the Postal Service, Burroughs was restricted to suggesting design changes, and it could not unilaterally add warning statements to the MPLSM. The facts further establish that Burroughs did make suggestions for altering the MPLSM keyboard to address human factors issues, but the Postal Service denied each request. The court finds that even if it were to impose a broader duty of warning on the defendant, the uncontroverted facts preclude the imposition of liability on such a basis here.

IT IS ACCORDINGLY ORDERED this 20th day of February, 1996, that the defendant's motion for summary judgment (Dkt. No. 51) is hereby granted.

APPENDIX A

Figure 1. Multi-Position Letter Sorting Machine, Model 120. Console Side.