874 F.2d 946
 Prod.Liab.Rep.(CCH)P 12,137
Gary E. RAMEY; Amanda C. Ramey, his wife, Plaintiffs-Appellants,
v.
MARTIN-BAKER AIRCRAFT COMPANY, LTD., Defendant-Appellee,
and
McDonnell Douglas Corporation; Quinten Rix; Thomas E.
Waller, Defendants.
Gary E. RAMEY; Amanda C. Ramey, his wife, Plaintiffs-Appellants,
v.
Quinten RIX, Defendant-Appellee,
and
Martin-Baker Aircraft Company, Ltd.; McDonnell Douglas
Corporation; Thomas E. Waller, Defendants.
 Nos. 87-1716, 87-1765.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 12, 1989.
Decided May 9, 1989.
Rehearing and Rehearing En Banc Denied June 6, 1989.
 
 Thomas B. Wheeler, Baltimore Md. (Patrick A. O'Doherty, Catonsville, Md., David M. Williams, on brief), for plaintiffs-appellants.
 Bruce Duplan Campbell (Keith Gerrard, Perkins Coie, Seattle, Wash., on brief), Judith Ann Bollinger (Joseph G. Finnerty, Jr., Piper & Marbury, Jay I. Morstein, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., on brief), for defendants-appellees.
 Before ERVIN, Chief Judge, and WINTER and MURNAGHAN, Circuit Judges.
 ERVIN, Chief Judge:
 
 
 1
 Gary E. Ramey ("Ramey") and his wife, Amanda C. Ramey, appeal from orders of summary judgment in favor of Quinten Rix, Ramey's supervisor, and Martin-Baker Aircraft Co., Ltd. ("Martin-Baker"), the manufacturer of an aircraft component Ramey believes injured him through its defective design. The district court held Rix immune from suit under a provision of the Maryland Workers' Compensation Act, Md.Ann.Code art. 101, Sec. 58 (1985). The court also held that the military contractor defense insulated Martin-Baker from liability. We affirm.I.
 
 A.
 
 2
 Ramey, an Air Force-trained aircraft mechanic, worked for Kirk-Mayer, Inc. Kirk-Mayer supplied skilled workers, among them Ramey, to the McDonnell Douglas Corporation for service at the Navy's Patuxent River Naval Air Test Center ("Patuxent"). McDonnell Douglas, the prime contractor for the Navy's F-18 fighter aircraft, assigned Ramey to its F-18 full-scale development (FSD) program.
 
 
 3
 On October 27, 1981, Quinten Rix, Ramey's supervisor and a McDonnell Douglas employee, instructed Ramey to help Thomas E. Waller, another aircraft mechanic, remove the SJU-5 ejection seat[1] from an F-18. The F-18 was one of seven, apparently the first seven produced, then undergoing tests at Patuxent.[2] While the two were trying to remove the seat from the F-18's cockpit, they inadvertently triggered one of the seat's explosive charges. Ramey fell from the F-18's wing to the hangar floor when the charge exploded, injuring his left leg and foot.
 
 
 4
 The immediate cause of Ramey's accident is not in dispute. Because the cranes that mechanics ordinarily used to lift ejection seats from aircraft were not suitable, Ramey and Waller tried to manhandle the seat out of the cockpit. Ramey realizing the seat was too heavy to lift, dropped the seat back into the cockpit. The drop jarred one of the seat's explosive charge trigger mechanisms and began the charge's detonation sequence. An audible alarm gave Ramey enough warning to allow him to move from a position straddling the cockpit to the wing before the charge exploded.
 
 
 5
 Ramey had no specific training on the F-18 ejection seat. Waller had about one hour of instruction on the seat. The two worked from McDonnell Douglas Quality Planning Instruction Sheet No. 74-82-02 (QPIS). Instruction 9 of the QPIS recites "Disconnect ejection seat aircraft grounded maintenance pin set for seat bucket removal." Waller and Ramey interpreted the instruction to command removing the seat's safety pin set.[3] The set would have prevented the seat's explosive charges from detonating.
 
 
 6
 Martin-Baker manufactured the ejection seat as a subcontractor to McDonnell Douglas. Ramey believes Martin-Baker "underdesigned" a component of the seat so that the anticipable, and perhaps inevitable, movements and collisions the seat undergoes during maintenance could trigger the seat's explosive charges. Ramey also believes Martin-Baker appreciated but failed to apprise the Navy of the risk the seat posed to mechanics, and that the Navy had not otherwise learned of the risk.
 
 
 7
 Ramey specifically directs our attention to the design of the seat's drogue firing lever initiator sear assembly ("assembly"), the component Ramey believes was defectively designed. The assembly controls deployment of the seat's drogue parachutes. The drogues deploy under the impulsion of explosive cartridges in the seat's drogue "gun." It was these cartridges that Ramey and Waller triggered.
 
 
 8
 Three components, the timing release mechanism (TRM), the trip rods, and the safety pins, ordinarily prevent accidental detonation of the seat's explosive charges. As we have observed, Ramey and Waller had removed the safety pins before trying to lift the seat. Ramey and Waller had also disconnected the trip rods, which ordinarily attach both to the seat and the aircraft's hull and prevent charge detonation until the seat separates from the hull during ejection. The TRM, the component that directs the sequential firing of the seat's various charges and rocket motors, was also ordinarily restrained from operating by a trip rod. The men left the seat's trip rods dangling from the seat's firing sears, the actual explosive triggers.
 
 
 9
 Navy and McDonnell Douglas investigators concluded that when Ramey dropped the seat back into the cockpit, the TRM trip rod caught on the F-18's hull. The effect was just as if the trip rod had registered separation during ejection. The force on the trip rod removed the assembly sear, which in turn triggered the drogue gun charge.
 
 
 10
 Having discussed the role of the various members of the civilian cast, we now review the Navy's role as it relates to Ramey's allegations. McDonnell Douglas, with Navy approval, chose Martin-Baker to develop the seat. The Navy specified that the design of the seat should comply with its specification 18471, prepared by ejection seat specialists from the Navy Air Systems Command ("NAVAIR") Airborne Equipment Group.[4] NAVAIR evaluated and approved the original seat design as well as all subsequent design modifications.[5]
 
 B.
 
 11
 The Rameys commenced this action in the Maryland Circuit Court for St. Mary's County. The Rameys asked damages from Martin-Baker, McDonnell Douglas, Rix and Waller for Mr. Ramey's injuries and for harm to their marital relationship. The complaint alleged negligence on the part of all defendants and included strict liability and warranty claims against Martin-Baker and McDonnell Douglas. The circuit court shortly ordered summary judgment in favor of McDonnell Douglas, holding it immune from suit as Ramey's statutory employer under the Act.[6] The remaining defendants then removed the suit to the federal district court.
 
 
 12
 The district court granted Rix's motion for summary judgment. The court found Rix immune from suit under Athas v. Hill, 300 Md. 133, 476 A.2d 710, 711 (1984), which held that a supervisory employee is not liable under the Act for conduct in furtherance of a nondelegable duty of the employer.
 
 
 13
 The district court also dismissed Martin-Baker on its motion for summary judgment. The court held that the military contractor defense protected Martin-Baker from claims based on its role in designing the seat.II.
 
 A.
 
 14
 Resolution of this appeal requires us to apply the government, or more precisely the military, contractor defense. We first recognized and applied the defense in Tozer v. LTV Corp., 792 F.2d 403 (4th Cir.1986), cert. denied, --- U.S. ----, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988), a wrongful death action brought by the family of a Navy pilot killed in the crash of his reconnaissance aircraft. We promptly relied upon the defense in two more actions stemming from the deaths of military airmen, Dowd v. Textron, Inc., 792 F.2d 409 (4th Cir.1986), cert. denied, --- U.S. ----, 108 S.Ct. 2897, 101 L.Ed.2d 930-31, reh'g denied, --- U.S. ----, 109 S.Ct. 11, 101 L.Ed.2d 962 (1988), and Boyle v. United Technologies Corp., 792 F.2d 413 (4th Cir.1986), vacated and remanded, 487 U.S. ----, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The Supreme Court in Boyle adopted the test for the military contractor defense largely as we had elaborated it in Tozer.[7]
 
 
 15
 Tozer looked to McKay v. Rockwell Int'l Corp., 704 F.2d 444 (9th Cir.1983), cert. denied, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984), for the elements of the defense. McKay held that
 
 
 16
 a supplier of military equipment is not subject to [strict liability in tort] for a design defect where: (1) the United States is immune from liability under Feres [v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950)] and Stencel [Aero Engineering Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977)], (2) the supplier proves that the United States established, or approved, reasonably precise specifications for the allegedly defective military equipment, (3) the equipment conformed to those specifications, and (4) the supplier warned the United States about patent errors in the government's specifications or about dangers involved in the use of the equipment that were known to the supplier but not to the United States.
 
 
 17
 704 F.2d at 451.
 
 
 18
 The Court in Boyle described the military contractor defense as the product of the interplay between two areas of "peculiarly federal concern." 487 U.S. at ----, 108 S.Ct. at 2514, 101 L.Ed.2d at 453. The first area of concern to the United States is its contractual relationship with the civilian contractor. Id. While the dispute in Boyle did not involve the United States as a party, and sounded in tort rather than in contract, it nonetheless arose from the defendant's performance of its contract with the United States. Id. The provenance of the defendant's liability lying ultimately in its relationship with the United States, the Court found the case implicating "the obligations to and rights of the United States under its contracts," a realm "governed exclusively by federal law." Id.
 
 
 19
 The second area of consequence to the holding in Boyle was "the civil liability of federal officials for actions taken in the course of their duty." Id. The Court analogized the role of a civilian contractor performing its obligations under a procurement contract to that of a federal employee discharging his or her official duties. Id. Both instances import the same federal interest, that of "getting the government's work done." Id. 487 U.S. at ---- and n. 1, 108 S.Ct. at 2514 and n. 1, 101 L.Ed.2d at 453 and n. 1.
 
 
 20
 The Court therefore concluded that the suit between private parties directly affected important interests of the United States. This effect on areas of federal interest the Court found a necessary, but not a sufficient, condition to displace state law with federal common law, by way of a defense available only to the United States' contractors. Id. 487 U.S. at ----, 108 S.Ct. at 2514-15, 101 L.Ed.2d at 454.
 
 
 21
 The Court then found a sufficient condition to invoke the defense in the conflict between a provision of the Federal Tort Claims Act (FTCA) and state tort law. Id. 487 U.S. at ----, 108 S.Ct. at 2517-18, 101 L.Ed.2d at 457-58. The FTCA excepts from the United States' general consent to suit for its employees' torts "[a]ny claim ... based upon the exercise or performance ... [of] a discretionary function or duty on the part of a federal agency or an employee of the [United States], whether or not the discretion involved be abused." 28 U.S.C. Sec. 2680(a). The Court found the design of military equipment "assuredly a discretionary function" under Sec. 2680(a). 487 U.S. at ----, 108 S.Ct. at 2517-18, 101 L.Ed.2d at 457. With this established, the subversive effect on the United States' relationship with its military contractors were state court suits against contractors allowed to proceed became clear. Id. State court judgments against contractors would effectively pass through to the United States in the form of higher costs for military equipment. Id.[8] The significant conflict between federal policy as expressed in the FTCA and state tort law required the Court to displace state law with a doctrine protecting the identified federal interests.
 
 
 22
 The Court therefore ratified the federal common law test of military contractor immunity that we had announced in our decision in the case. The test insulates a military contractor from liability for claims against equipment it produced if (1) the United States approved reasonably precise specifications for the equipment; (2) the equipment conformed to these specifications; and (3) the contractor warned the United States about the dangers in the use of the equipment that were known to the contractor but not to the United States. 101 L.Ed.2d at 458.
 
 
 23
 We believe the district court correctly recognized that the Rameys' claims could not surmount the obstacle of the military contractor defense as we had articulated it in Tozer. Because of the Supreme Court's decision in Boyle, which followed the order of summary judgment in this case, we think it appropriate to parse the Boyle test and spell out the bases for our conclusion that no genuine issue remains that would allow the Rameys to avoid summary judgment.
 
 
 24
 There are two routes by which Martin-Baker may satisfy the first prong of the Boyle test. In Dowd, we indicated that even though the military had not developed or approved the specifications for the component at issue, "[t]he length and breadth of the [military's] experience with the [component]--and its decision to continue using it--amply establish government approval of the alleged design defects." 792 F.2d at 412 (also noting that "[the contractor] cannot modify [its] design without United States approval."). In Tozer, we held that "the defense will be permitted to a participating contractor so long as government approval of a design 'consists of more than a mere rubber stamp.' " 792 F.2d at 407-08 (citing Schoenborn v. Boeing, 769 F.2d 115, 122 (3d Cir.1985)).
 
 
 25
 We believe Martin-Baker has demonstrated Navy participation in design that amounts to more than a rubber stamping. The Navy issued the original design specifications for the seat. Navy engineers inspected and tested the seat's components, and examined a mock-up of the seat displaying, in particular, the seat-hull connections of which Ramey ran afoul. Moreover, as we detail more fully in our treatment of the third Boyle prong, the Navy had become aware of the possible hazards the seat posed to maintenance personnel well before Ramey's accident. Under both Tozer and Dowd, then, the evidence establishes the requisite Navy participation in design.
 
 
 26
 We do not understand Ramey to have argued that the seat deviated from Navy specifications. Nothing in the record suggests to us that the Navy found the seat not to conform to specifications. It is not our province, of course, to make such a finding in the Navy's behalf. Tozer, 792 F.2d at 408-09. We accordingly conclude that no issue exists as to the seat's conformity to Navy specifications.
 
 
 27
 Ramey's most substantial argument, we believe, is that Martin-Baker knew but failed to warn the Navy of the risks the seat posed to maintenance personnel. As we and the district court have observed, there is no doubt that the seat is potentially dangerous to maintenance personnel. What is more, we have noted the ambiguities in the QPIS Waller and Ramey used as a guide to servicing the seat. These ambiguities, arguably traceable to Martin-Baker, may have compounded the hazards to which Ramey was subject. We conclude, however, that the Navy was well aware of the seat's harmful propensities before Ramey's mishap.
 
 
 28
 We have observed that the Navy had F-18s in fleet service prior to the time of Ramey's accident. The record of message traffic among Navy officers and agencies reveals full knowledge of the danger implicit in prevailing maintenance protocols.[9] While we regret that this recognition did not benefit Ramey, we find no issue that Martin-Baker could have apprised the Navy of any material circumstances not already known to it.[10] Considering as we do that the evidence does not leave the applicability of the military contractor defense at issue, we agree with the district court that the defense insulates Martin-Baker from liability for Ramey's injuries.
 
 B.
 
 29
 We now consider whether the district court correctly held Rix immune from suit under the Act. The district court concluded that McDonnell Douglas's immunity under the Act, which the Rameys do not contest, extended to Rix as a McDonnell Douglas employee. We believe this conclusion was correct as a matter of Maryland law.
 
 
 30
 The Act generally requires employers to compensate employees for work-related death or disability. Md.Ann.Code Art. 101, Sec. 15 (1985). Employees entitled to compensation under the Act ordinarily forego "any and all rights of action whatsoever against any person whomsoever." Md.Ann.Code Art. 101, Sec. 36. Section 58 of the Act, however, preserves the employee's right of action for injury "caused under circumstances creating a legal liability in some person other than the employer to pay damages...." Md.Ann.Code Art. 101, Sec. 58.
 
 
 31
 In Athas v. Hill, 300 Md. 133, 476 A.2d 710, 711 (1984), Maryland's highest court faced the issue of whether section 58 "authorizes an employee to sue a supervisory coemployee for negligently discharging the employer's duty to provide a safe place to work." The court concluded that "supervisory coemployees may be subject to liability only for negligently breaching a duty of care which they personally owe to the employee." Id. The district court concluded in this case that in assigning Waller and Ramey to service the F-18 ejection seat, the action the Rameys alleged to have been negligent, Rix was performing McDonnell Douglas's duty of selecting and assigning workers to tasks. We believe Athas commands affirmance.
 
 
 32
 Athas was a suit by a restaurant employee, Nicholas Athas, against the supervisors of the country club where Athas had worked. Athas suffered permanent disability and disfigurement as a result of a knife attack by a chef at the country club. Athas alleged that the supervisors knew or should have known of the chef's violent proclivities and had failed to warn or otherwise protect Athas from the hazard. The supervisors conceded that they had negligently discharged their duty to hire and retain competent, pacific employees. 476 A.2d at 711.
 
 
 33
 The court in Athas recognized the established rule that Sec. 58 allows an employee to sue a coemployee whose negligence caused injury. Id. at 712. The court concluded, though, that in performing the "managerial and personnel functions" of providing Athas a safe workplace and retaining only nonviolent employees, the supervisors discharged only a nondelegable duty of the country club, their employer, and so had no duty running to Athas. Id. at 718. Nor did the court find evidence that the supervisors committed any direct act of negligence by failing to reveal or inquire into the chef's criminal record. Id. at 718-19. The court therefore found no duty of care owed by the supervisors to Athas.
 
 
 34
 Rix's situation, while not on all fours with that of the supervisors in Athas, amply indicates that the actions Ramey charges were negligent were in furtherance only of McDonnell Douglas's nondelegable duty to Ramey, and created no personal duty of care on Rix's part. Out-of-state cases cited by the Athas court, all of which illustrate the "Wisconsin approach" to coemployee liability, make clear that routine work assignments and supervision are aspects of the nondelegable duty of providing employees a safe place to work. Id. at 715-17 ("The duty of proper supervision is a duty owed by a ... supervisory employee to the employer, not to a fellow employee.") (citing Kruse v. Schieve, 61 Wis.2d 421, 428-29, 213 N.W.2d 64 (1973)) ("[P]ersonal liability cannot be imposed upon the ... employee simply because of his general administrative responsibility for performance of some function of the employment.... If the defendant's general responsibility has been delegated with due care to some responsible subordinate ... he is not himself personally at fault ... unless he ... knows or ... should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm.") (citing Canter v. Koehring Co., 283 So.2d 716, 721 (La.1973)).[11] We therefore conclude that the district court correctly held Rix's selection of Waller and Ramey to remove the seat to have been in furtherance of McDonnell Douglas's nondelegable duty of supervision.III.
 
 
 35
 For the reasons stated above, the district court's orders granting summary judgment in favor of Martin-Baker and Rix are affirmed.
 
 
 36
 AFFIRMED.
 
 
 
 [1]
 "Ejection seat" ("seat") is a shorthand for a remarkable craft within a craft. The pilot of a stricken F-18 need only pull a handle to commence processes that will, within seconds, propel him safely from his airplane. The seat automatically secures the pilot in position and, under the impetus of explosive charges, launches itself forward and outward from the cockpit. Once the seat clears the airplane, small drogue parachutes right and slow it. A main parachute then deploys to allow a safe landing. The seat is designed to launch a pilot to safety in situations ranging from a mishap on an aircraft carrier flight deck to trouble in an aircraft traveling upside down at up to six hundred miles an hour
 
 
 [2]
 McDonnell Douglas produced the seven FSD aircraft before commencing production of F-18s for Navy fleet service. The Navy used these preproduction craft to test the flight characteristics of the F-18. By the date of Ramey's accident, production model F-18s had been in fleet service with the Navy for some time
 
 
 [3]
 The evidence about whether the men correctly interpreted QPIS instruction 9 is mixed. Joseph Charleville, McDonnell Douglas' F-18 ejection seat specialist, testified in a deposition that it was wrong and dangerous to remove the pins. Charleville also testified that the QPIS applied only to removal of a seat by crane, and not to the manual removal Ramey and Waller attempted. Rix testified, however, that he read the instruction to apply to manual disassembly and to require removal of the entire pin set. It appears that the safety pins on the FSD aircraft were centrally connected, and could only be removed as a set. The pin set used on operational F-18s allowed removal of individual pins
 
 
 [4]
 McDonnell Douglas in turn translated Navy specifications 18471 into its procurement specification 74-800200, which Martin-Baker used as working specifications for the seat. The Navy reviewed and changed specification 74-800200 as it saw fit. Specification 74-800200 required the seat to be easily removable for maintenance. Before McDonnell Douglas delivered the first FSD aircraft, Navy personnel tested and approved the situation of the devices, including the trip rods that connect seat to hull. From May through August of 1978, the Navy tested the seat and scrutinized a mock-up seat that Martin-Baker had prepared. The mock-up depicted the location and routing of all ballistic (explosive) devices, connections, and linkages
 
 
 [5]
 The FSD aircraft of which Ramey complains did not have incorporated a seat design modification featured in production aircraft. After the Navy discovered that salt spray, salt air, and dust could infiltrate the seat's firing mechanism, the Navy, McDonnell Douglas, and Martin-Baker modified the design of the seat's trip rods to curb the infiltration. On August 21, 1978, the Navy inspected and accepted for FSD use aircraft that did not contain the modified trip rod mechanism
 
 
 [6]
 The Rameys did not appeal from this order
 
 
 [7]
 The Court declined to adopt the first of four prongs of the Tozer test. 487 U.S. at ----, 108 S.Ct. at 2516-18, 101 L.Ed.2d at 456-57. The prong inquired whether the Feres doctrine, which prohibits "all [military] service-related tort claims against the [United States]" would apply had the plaintiff elected to sue the United States as well as, or instead of, its contractor. Id. 487 U.S. at ----, 108 S.Ct. at 2517-18, 101 L.Ed.2d at 457
 The court remanded Boyle to allow us to clarify the basis for our conclusion that the district court had erred in refusing to grant the contractor's motion for a judgment n.o.v. 487 U.S. at ----, 108 S.Ct. at 2519, 101 L.Ed.2d at 459.
 
 
 [8]
 We had in Tozer anticipated the same risks of "a decrease in contractor participation in design, an increase in the cost of military weaponry and equipment, and diminished efforts in contractor research and development" absent a military contractor defense. 792 F.2d at 407
 
 
 [9]
 An August, 1981 telex from the Commander of the Pacific Naval Air Operations ["Commander"] to other Navy authorities identifies
 Deficiencies in technical manuals [and] procedures ... concerning the SJU-5/A ... ejection seat, installed in the F/A-18 ... Of particular concern is the maintenance concept governing the removal/installation of the ejection seat with an armed drogue gun. Present procedures call for the removal of a fully armed seat from the aircraft.... This potentially hazardous situation has been addressed to NAVAIR and [the Naval Safety Center] ... with recommendations to dearm SJU-5/A ejection seat drogue gun in aircraft prior to removal and arm seat after installation. (Emphasis added).
 A message from the Naval Safety Center to NAVAIR, sent later in August, 1981, described the hazard posed by removal of a seat with an armed drogue gun as "an inherent [sic] unsafe condition" and an "impediment ... to safe and effective performance of escape system maintenance...."
 A September 26, 1981, telex from the Commander to NAVAIR, the Naval Safety Center, and his Atlantic counterpart reiterated the hazard and "recommend[ed] termination of present F/A-18 ejection seat maintenance procedures and immediate action to initiate safe seat maintenance procedures."
 
 
 [10]
 Our conclusion that the Navy knew of the risks associated with removing a seat with an armed drogue gun obviates the need to grapple with one potentially troublesome issue. There is no dispute that Martin-Baker knew both the risks of removing an armed seat and that McDonnell Douglas had not included Martin-Baker's safety recommendations in the QPIS. Martin-Baker had recommended removal of the TRM and drogue gun ballistic charges and installation of safety pins in all potentially hazardous components before proceeding with seat removal. There is also no dispute that Martin-Baker's communication with the Navy had always been via McDonnell Douglas and that McDonnell Douglas bore responsibility for preparing maintenance manuals for the F-18. Because we conclude the Navy was already aware of the risk at issue, we need not consider whether Martin-Baker would otherwise have been required to warn the Navy directly of the risk in order to assert successfully the military contractor defense
 
 
 [11]
 There is no evidence that Rix considered or should have considered Waller and Ramey unqualified to remove the seat, or that either Waller or Ramey objected to the assignment as outside his bailiwick. As we have observed, Rix believed the QPIS from which the men worked applied under the circumstances and that their removal of the seat's safety pins was correct according to the QPIS. We therefore have no basis to conclude that Rix was on notice of facts that indicate a personal duty to warn or otherwise act to protect Ramey