Paul YEROSHEFSKY, et ux.[1]  Plaintiffs,

v.

UNISYS CORPORATION, Defendant.

Civil No. PJM 95–1607.

United States District Court,
D. Maryland,
Southern Division.

April 24, 1997.

1. This case was originally styled "Bernard W. Clark, et al. v. Unisys Corporation."  Clark and his wife Viola were named Plaintiffs, Paul Yeroshefsky and his wife were additional Plaintiffs. Clark and his wife have since filed a voluntary dismissal of their claims with prejudice. The four original Plaintiffs began as part of a larger group of plaintiffs who filed repetitive stress injury actions in the United States District Court for the Eastern District of New York. That court transferred the claims of the four original Plaintiffs to this Court.

Stephen J. Nolan, Nolan, Plumhoff & Williams, Towson, MD, Carl E. Tuerk, Jr., Mary Rose Elizabeth Cook, Cooper, Beckman & Turek, Baltimore, MD, for Plaintiffs.

Matthew James Cuccias, Carr, Goodson & Lee, Rockville, MD, for Defendant.

## OPINION

MESSITTE, District Judge.

### I. *Introduction*

Plaintiffs Paul Yeroshefsky and Susan Lorrain Yeroshefsky, his wife, sue Unisys Corporation as successor to Burroughs Corporation. Plaintiffs claim that Paul Yeroshefsky, while employed by the U.S. Postal Service (variously, "USPS" or "Service"), used certain keyboard equipment manufactured, designed, and distributed by Burroughs that caused him repetitive stress injury. Defendant has moved for summary judgment on the basis of the government contractor defense. Having considered the pleadings and the entire record, the Court will grant Defendant's Motion.

### II. *Summary Judgment Law*

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990) (en banc) *cert. denied* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Pure questions of law are properly decided at the summary judgment stage. *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir.1992). Genuine issues of fact sufficient to defeat summary judgment must be based on more than mere allegations or denials in the pleadings. The non-movant must present evidence supporting his position through "deposition, answers to interrogatories, and admissions on file, together with ... affidavits, if any." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### III. *Facts*

A) Paul Yeroshefsky, at all relevant times, was employed as a letter sorter at a United

States Postal Service facility in Capitol Heights, Maryland. Susan Lorraine Yeroshefsky is his wife.

In the course of Yeroshefsky's employment, he used equipment known as a multipositional letter sorting machine (MPLSM), Model No. 140–12. The MPLSM is approximately 77 feet long and 9 feet high and consists of 12 consoles at which postal service operators use two ten-key piano-style keyboards arranged in two tiers. As the MPLSM mechanically conveys pieces of mail past the operator console, the operator reads the zip code and keys a code on the keyboard. The tracking system of the machine reacts to the codes and directs the letter to the proper sorting bin located on the other side of the machine.

Yeroshefsky claims that as a consequence of defects in the design of the MPLSM, he sustained bilateral carpal tunnel injury. Among the defects in the MPLSM keyboard he cites are the absence of adjustability; insufficient knee clearance; inappropriate depth of work surface; inappropriate envelope slot height; lack of upper body support; poor keyboard feedback; key vibration; inconsistent and poor key force; excessive keying rate demands; inappropriate key configuration; and inadequate documentation of risks in training manuals.

B) The USPS initiated the design and development of the MPLSM in 1956 through a National Bureau of Standards contract with Rabinow Engineering Company. Rabinow drew specifications for and designed and built a model of the MPLSM which was installed in the U.S. Postal Laboratory in Washington, D.C. At the Postal Laboratory, postal service engineers along with human factor specialists performed tests on the model to "prove out" its operational capabilities. The Service also reviewed Rabinow's drawings to insure that they met USPS requirements. In the course of this testing and evaluation, the USPS made several modifications to Rabinow's design, which included repositioning the keyboard to make it more accessible to the operator and reducing the machine's noise level.

In 1958, the USPS awarded Burroughs Corporation a research and development contract to build ten prototypes of Rabinow's MPLSM design. The USPS provided Burroughs with drawings and "rigid postal specifications," including specifications for keyboard design. It also made accessible the Rabinow model located at the Postal Lab. Changes in design of the MPLSM, including changes to the keyboard, could only be made as directed by the USPS. Thereafter Burroughs and the USPS met extensively to review potential design improvements. Representatives of both entities, including human factors specialists, engaged in an active "back and forth" exchange of information and ideas.

Beginning in 1959, the USPS installed the ten Burroughs prototype MPLSMs in post offices in Flint and Detroit, Michigan, and in Washington, D.C., where the Service inspected and evaluated the prototypes while in operation. When a machine did not meet its criteria, the USPS took corrective measures. Ultimately the Service accepted all the Burroughs prototypes as conforming in all material respects to its requirements.

In 1963, after four years of review and evaluation of the prototypes including human factors analysis, the USPS drafted a comprehensive detailed set of production drawings and specifications. These drawings and specifications detailed several aspects of the machine including tolerances; design and materials for the keyboard; shape, tension, triggering pressure and stroke distance of the keys; key spacing; key actuating pressure; and range of operating speeds. Each MPLSM drawing was signed and approved by the Service. The drawings and specifications were thereafter used to competitively bid contracts for mass production of the device.

In 1964, the USPS awarded Burroughs the first MPLSM production contract. Consistent with the drawings and specifications in the bid package, Burroughs was engaged to manufacture 26 MPLSMs, designated Model 120/121. The specifications dictated the requirements in detail, incorporating numerous federal, national and military standards.

Among other things, they required that the MPLSM carry a number of safety devices. Thus:

Safety Devices. The machine shall be furnished with suitable devices as required by the specifications and as shown on the drawings ... All special safety devices for ... protection of operators ... shall be provided as specified herein or as shown on the drawings.

Without USPS approval, Burroughs was not permitted to add "warnings, markings or labels" to the MPLSMs.

The USPS in fact controlled all deviations from or changes to the specifications and drawings:

All wiring diagrams, final assemblies, subassemblies or parts which the contractor may elect to adjust, refine, change or alter in any manner; or manufacture under specifications which differ in the slightest detail from those specified or shown on the drawings shall be approved by the Postal Service.

To ensure that the MPLSMs conformed with its specifications, the USPS conducted a "First Article Test" on the first unit manufactured under the 1964 contract. This First Article Test, which was conducted by Postal Service operators at Burroughs' production facility, consisted of a detailed physical and functional examination. Only after the USPS pronounced the test successful was Burroughs authorized to commence production.

USPS testing of the MPLSM did not end there. After production got under way, representatives of the USPS and the Defense Contract Administrative Service conducted subassembly and in-process inspection of the machines. The USPS also proceeded to conduct a "live mail test" of the device, monitoring Postal Service operators over a regular work shift. Whatever adjustments were required were directed by the USPS, after which a second "live mail" test was conducted. Only then did the USPS formally certify that the machines conformed in all material respects to USPS specifications. Only then did USPS accept the units.

Over the next 20 years, from 1966 through 1986, Burroughs continued to manufacture MPLSMs in strict conformity with USPS drawings and specifications. Burroughs and postal inspectors held numerous meetings and exchanged numerous reports relative to the device. Eventually the Service awarded Burroughs a series of fixed price competitively bid contracts for the manufacture of more than 900 MPLSMs. Continuously throughout, the Service maintained close control over the operation of the MPLSMs by postal service employees. Continuously throughout, the Service assumed exclusive responsibility for instructing MPLSM operators in the proper use of the machine, including instruction as to correct operator posture and correct positioning of their hands and fingers while keying.

In 1970, the USPS entered into a contract with GATX Corporation to modify certain aspects of the MPLSM design. GATX was engaged to design and manufacture what became known as the Zip Mail Translator (ZMT) system, which was to be retrofitted on the Model 120/121 MPSLMs already in service. What the ZMT did was to add an auxiliary ten-key keyboard above the original MPLSM keyboard to accommodate the Service's shift from chordal keying of memorized codes to sequential keying of zip code information. While Burroughs was asked to and in fact installed a certain number of ZMT kits on existing MPLSMs, it remained at all times subject to review and approval by the Postal Service. Burroughs played no part in the design of the ZMT system.

In 1974, the USPS contracted with Burroughs to manufacture 150 MPLSMs, designated Model 140/141, which differed from the earlier model by reason of its incorporation of the ZMT system into the design. In addition, the later model was a modularized unit consisting of 18 sections capable of easy shipment and installation. In all other material respects, the USPS specified that the Model 140/141 MPLSMs were to function identically to the Model 120/121's.

Over time, the USPS required Burroughs to redraft the Model 120/121 so as to include the ZMT system and the modularization of the MPLSM. Again, the Service made all

design decisions; Burroughs could make none without Service approval. Again, USPS technicians engaged Burroughs experts in extensive back-and-forth discussions relative to the enhanced model.

In 1979, the USPS designed what it termed the Expanded Zip Retrofit (EZR) system, an electronic modification that replaced the retrofitted ZMT units and permitted the use of a 9–digit zip code in sorting mail. In 1980, it awarded Burroughs a contract to develop a production version of the EZR prototype. As with the original MPLSM, Burroughs was given access to the EZR prototype in Washington as well as the drawings and parts list generated by the Service. Again, Burroughs was precluded from deviating from the drawings without prior Service approval. Again, extensive dialogue between the Service and Burroughs representatives relative to the modified product took place. Again, a First Article Test by the Service followed with a successful result. Only then did the USPS permit Burroughs to commence production. To the extent that non-conformities were noted in the product post-production, the Service directed whatever adjustments needed to be made. Thereafter the product was subject to retesting by USPS. As before, the USPS accepted each EZR system as conforming in all material respects to its specifications only after conducting live mail tests.

From the beginning, the USPS showed concern for matters beyond the mere operating efficiency of the MPLSM. Consistently it demonstrated sensitivity to human factors issues involving the console and to keyboard operation. From the middle to late 1950s, it assigned human factors engineers to study the interaction between the MPLSM operator and the machine. In the early 1960s, it expanded its in-house human factors capabilities to include consideration of human factors in keyboard and code design, as well as letter sorting rates. It established a laboratory to study human engineering in postal mechanization and created a human factors research and development 5–year plan that focused on developing work space and keyboard design standards as well as fatigue reduction. It also issued a list of informational directives for use of the MPLSMs, including discussion of hand and arm fatigue in keyboard operation and the use of adjustable chairs with arm rests.

During the 1960s, the USPS also authored or received numerous studies concerning human engineering and MPLSM keyboard design. Among the issues addressed were optimum key pressure, keyboard configuration, proper seating and keying positions, work-rest cycles, operator fatigue, and availability of arm and foot rests. In 1976, the Service prepared an annotated bibliography of human factors reports, documents and related publications. In the same year, the American Postal Workers Union, in conjunction with the National Institute of Occupational Safety and Health, undertook a long-term study of job stress and health concerns involving the MPLSM, including a study of the effects of keying on machine operators. In consequence of that study, a nationwide survey of letter sorting machine operators was commissioned, the results of which indicated that, in addition to numerous other health complaints, operators were complaining of stiff or sore wrists, loss of feeling in fingers and wrists, cramps in fingers and loss of arm and hand strength. These results were spelled out in a formal report to the American Industrial Hygiene Conference. Throughout the 1980s the Service continued to receive reports of the effect of the MPLSM on its operators. By 1984, public concern reached the point where Congressional hearings were deemed necessary to explore the alleged effects of repetitive stress injuries on USPS employees, including MPLSM operators.

The USPS took note and responded. Soon after the Congressional hearings, it commenced modifications in the postal service workplace, including simplification of the MPLSM keying process, reduction of noise levels and provision of adjustable operator chairs. It also implemented an employee education program, developing strengthening exercises for operators' hands and wrists, preparing training manuals, and administering training programs. Burroughs assumed responsibility for none of this.

What Burroughs did do, however, was to provide the USPS with whatever information it had regarding the various human factors issues relating to the operation of the MPLSM. Indeed, to the extent that Burroughs perceived connections between the MPLSM and worker well-being, it went so far as to propose modifications in the Rabinow design that it felt might improve the machine and help reduce operator fatigue. Notably, the USPS rejected each and every one of these.

### IV. Contentions of the Parties

Relying on state law, Plaintiffs sue Unisys on the theory that Burroughs defectively designed the MPLSM and on the alternate theory that Burroughs failed to warn ultimate operators of its dangers. Unisys relies on the governmental contractor defense the gist of which, it says, holds that, given certain circumstances, a contractor manufacturing products for the federal government is not liable in tort to third parties. Plaintiffs argue that this defense is available only to military, not to civilian contractors. Defendants vigorously disagree.

Plaintiffs argue further that, even if available in the non-military context, the government contractor defense should not apply here because the government's design specifications were not sufficiently specific and because, in any case, Burroughs failed to warn the government about dangers the contractor was aware of but the government was not. Unisys responds that not only were the government's specifications reasonably precise; there was absolutely no failure to warn on Burroughs' part.

As for Plaintiffs' alternative theory of liability—failure to warn ultimate operators—Plaintiffs argue that, unless the government has actually expressly prohibited a warning, a contractor cannot rely on the government contractor defense. Unisys says that Plaintiffs misstate the law. For the government contractor defense to prevail against a failure to warn claim, it is sufficient if the government has merely approved such warnings as were given; that the contractor conformed to the specifications regarding warnings, and that the government knew as much about the alleged defects in the equipment as the con-

tractor did. According to Unisys, all these conditions obtained in the case at hand.

### V. The Government Contractor Defense

In *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the U.S. Supreme Court held that a contractor manufacturing products for the federal government will not be liable in tort to third parties upon proof that:

(1) the United States approved reasonably precise specifications for the products;

(2) the contractor's equipment conformed to those specifications; and

(3) the contractor warned the United States about the dangers and the use of the equipment that were known to the contractor but not to the United States.

*Id.* at 512, 108 S.Ct. at 2518.

The Court held this so-called "government contractor defense" to be a matter of federal common law which displaces state law. *Id.* at 504, 512, 108 S.Ct. at 2514, 2518–19. Because federal procurement actively implicates "uniquely federal interests" in "getting the Government's work done," when the three referenced elements are present, state tort law significantly conflicts with federal interests and federal common law preempts it, providing a complete defense against state law claims. *Id.*

There is no question that the government contractor defense applies to military contractors; the critical threshold question in the present case is whether it extends to non-military contractors as well.

*Boyle* involved an action against the manufacturer of a helicopter for defective design of the escape hatch which, allegedly because it did not open, occasioned the drowning of its Marine co-pilot. In the opening sentence of the majority opinion, the Court stated that "[t]his case requires us to decide when a contractor providing military equipment to the Federal Government can be held liable under state tort law for injury caused by a design defect." 487 U.S. at 502, 108 S.Ct. at 2512. At a later point the Court observed that "the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary

716

function...." *Id.* at 511, 108 S.Ct. at 2518. It further noted that military acquisitions involve "not merely engineering analysis but judgment as to the balance of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effective-. ness." *Id.* Thus, "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512, 108 S.Ct. at 2518.

*Boyle* emanated from the Fourth Circuit. *See* 792 F.2d 413 (4th Cir.1986), *vacated,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). While the Fourth Circuit's decision did not elaborate on the policies underlying the government contractor defense, the panel did cite *Tozer v. LTV Corp.,* 792 F.2d 403 (4th Cir.1986), *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988), decided the same day it decided *Boyle,* which dwelled at length on the importance of the military nature of the procurement. *Tozer,* 792 F.2d at 414.

Post-*Boyle,* the Fourth Circuit has continued to stress the military nature of the procurement as underpinning the defense. *See Kleemann v. McDonnell Douglas Corp.,* 890 F.2d 698 (4th Cir.1989) *cert. denied,* 495 U.S. 953, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990); *Ramey v. Martin–Baker Aircraft Co. Ltd.,* 874 F.2d 946 (4th Cir.1989). *Tozer, Kleemann* and *Ramey,* however, all involved military—not civilian—equipment and contractors. In none of these cases was the court called upon to determine whether the government contractor defense extends to the non-military setting.

Dissenting in *Boyle,* Justice Brennan (joined by Justices Marshall and Blackmun) foresaw that the majority's holding might well extend the defense beyond the military setting "to any made-to-order gadget that the Federal Government might purchase after previewing plans—from NASA's Challenger space shuttle to the Postal Service's old mail cars." 487 U.S. at 516, 108 S.Ct. at 2520 (Brennan, J., dissenting). Significantly, the *Boyle* majority left this interpretation unchallenged.

Justice Brennan's premonition appears to have been well-founded. In the first place, the *Boyle* majority expressly rejected the Fourth Circuit's holding that the government contractor defense was grounded in the doctrine established in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), which had precluded all liability for injuries to military personnel. *Boyle,* 487 U.S. at 510, 108 S.Ct. at 2517–18. Instead, the Court bottomed the defense on the discretionary function exemption to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), *Boyle,* 487 U.S. at 511, 108 S.Ct. at 2518, which by its terms is not limited to claims arising out of actions by the military but applies to *any* actions requiring the exercise of discretion by "a federal agency or employee of the Government." 28 U.S.C. § 2680(a). Moreover, in sharp distinction to *Tozer, Kleemann,* and *Ramey,* the *Boyle* Court's policy concern was in no sense peculiar to military procurement. Thus the Court observed:

> [I]t is plain that the Federal Government's interest in the procurement of equipment is implicated by suits such as the present one.... The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected.

*Boyle,* 487 U.S. at 506, 507, 108 S.Ct. at 2515, 2516.

In addition, as noted by the U.S. District Court for Kansas in *Wisner v. Unisys Corp.,* 917 F.Supp. 1501 (D.Kan.1996), the *Boyle* majority, by way of illustrating the scope of the government contractor defense, clearly suggested a neutral situation in which it might apply. Thus the *Boyle* Court explained that the defense would not apply where the government has contracted for an air conditioning unit with a specific cooling capacity but has not specified the precise manner of its construction. 487 U.S. at 509,

108 S.Ct. at 2516–17. The inescapable implication of this illustration is that if the government were to specify the precise manner of construction as well as the cooling capacity of the air conditioner, the government contractor defense would apply. "But an air conditioner," as the *Wisner* court observed, "is hardly a military instrument." 917 F.Supp. at 1511 n. 3. In other words, by dicta at least, the Supreme Court certainly seems to have endorsed the defense in the non-military context. One can only suppose that, had it wished to, the Court might have restricted its example to a military setting.

The federal circuits are split over whether the government contract defense applies to non-military as well as military contractors. Among the cases holding it available to both are *Carley v. Wheeled Coach*, 991 F.2d 1117 (3rd Cir.), *cert. denied*, 510 U.S. 868, 114 S.Ct. 191, 126 L.Ed.2d 150 (1993); *Boruski v. United States*, 803 F.2d 1421, 1430 (7th Cir. 1986); and *Burgess v. Colorado Serum Co.*, 772 F.2d 844, 846 (11th Cir.1985). Among those holding the defense applicable to military contractors only is *Nielsen v. George Diamond Vogel Paint Co.*, 892 F.2d 1450 (9th Cir.1990). District courts have taken positions on both sides of the question. *See e.g. Stone v. F.W.D. Corp.*, 822 F.Supp. 1211, 1212, n. 4 (D.Md.1993) (Motz, J.) ("some question about whether after *Boyle* it is necessary that the equipment involved be military equipment").

The Court acknowledges the emphasis that the Fourth Circuit placed on the military nature of the defense in *Tozer*, *Kleemann* and *Ramey*, but finds those cases distinguishable on the basis of the distinct military factual context in which they arose. In the Court's view, the Third Circuit in *Carley* gave *Boyle* its proper gloss:

> The imposition of liability on an independent contractor who enters into a procurement contract with the United States directly implicates the significant federal interest in the completion of the government's work. . . . That significant federal interest exists regardless of whether the

procurement contract is military or non-military in nature.

991 F.2d at 1120.

The *Carley* court emphasized that civilian procurement may involve "decisions that are as complex and sensitive as the selection of military products." *Id.* at 1124. "[T]o 'second-guess' federal policy decisions respecting the design of products for use in civilian products" would risk the same pass through of state tort judgments that the Supreme Court in *Boyle* sought to avoid. *Id.* at 1122. The *Carley* court, in this Court's opinion, captures the spirit of *Boyle* by declaring that "[i]t is the exercise of discretion by the government in approving a product design, and not whether the product was military or non-military in nature, which determines whether the government contractor defense is appropriate." *Carley*, 991 F.2d at 1124.

The Court adopts *Carley*'s rationale and holds that the government contractor defense is applicable in the civilian as well as the military context.

## VI. *Applicability of Government Contractor Defense to Failure to Warn Cases*

Assuming that the government contractor defense applies to a claim of defective design, Plaintiffs ask the Court to hold that defense has limited application to their alternative claim of failure to warn. They reason that the policy behind government discretion in the context of a design defect claim is irrelevant to a failure to warn claim. According to this argument, while a claim involving product design (particularly a design military in nature) may involve a significant government interest, no such interest is promoted when a contractor, military or non-military, remains silent about a known danger.

■ The Court considers the extent to which the government contractor defense applies to failure to warn claims.

While the Fourth Circuit has yet to address the question, several other Circuits have done so. All appear to recognize the applicability of the defense to a failure to warn claim, but the applications vary widely. The Second, Ninth and Eleventh Circuits, whose decisions Plaintiffs rely on, appear to

require that the government specifications actually prohibit warnings before the government contractor defense may be invoked. *See In Re Joint Eastern and Southern District New York Asbestos Litigation,* 897 F.2d 626, 632–33 (2nd Cir.1990); *In Re Hawaii Federal Asbestos Cases,* 960 F.2d 806, 812–813 (9th Cir.1992) (dictum); *Dorse v. Eagle–Picher Industries, Inc.* 898 F.2d 1487, 1489 (11th Cir.1990).

Decisions from the Third and Fifth Circuits would seem to permit the defense in broader circumstances. Thus, in *Russek v. Unisys Corp.* 921 F.Supp. 1277 (D.N.J.1996), the New Jersey federal court held that "where the manufacturer has established a Boyle defense as to the design defect, and the relevant specifications are silent as to the warnings, Boyle bars the failure to warn claim as well." 921 F.Supp. at 1293. The *Russek* court cited, among other cases, *Stout v. Borg–Warner Corp.,* 933 F.2d 331, 337, n. 2 (5th cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991) where the Fifth Circuit had noted that plaintiff there had not contended that his failure to warn claim could survive *Boyle* if the design effect claim did not. *Russek,* 921 F.Supp. at 1293; *see also Koutsoubos v. Boeing Vertol, Div. of Boeing Co.,* 553 F.Supp. 340, 344 (E.D.Pa.1982) (failure to warn claim is "merely repetitive of plaintiff's assertions concerning design effects").

The Sixth Circuit in *Tate v. Boeing Helicopters,* 55 F.3d 1150 (6th Cir.1995) has taken yet another position, holding that the government contractor defense will avail against a state law failure to warn claim where "(1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not." 55 F.3d at 1157. Assuming some warning is present, this test essentially transports to the failure-to-warn context the three-part test *Boyle* applied to design defect cases. As the *Tate* court observed: "the rationale for applying the government contractor defense to a failure to warn claim tracks the *Boyle* analysis closely." 55 F.3d at 1157.

Of these various applications, this Court finds the *Tate* rationale the most compelling and the one that the Fourth Circuit would be likely to follow. The essence of *Boyle,* as *Tate* notes, is that it is based on the discretionary function exception of the Federal Tort Claims Act. Requiring specific prohibition of warnings by the government would be inconsistent with the exercise of governmental discretion in the matter; hence government approval ought to depend on whether the government has reviewed and approved the warnings, not on whether they have specifically prohibited them. The applicability of the test from the Third and Fifth Circuits—that once the *Boyle* test is met for design defect purposes, it automatically forecloses the failure to warn claim—need not be decided at this time. For the present, it suffices to hold that, when warnings are in fact present, the *Tate* standard, *i.e.* the basic 3–part test of *Boyle,* applies to a failure to warn as well as a defective design claim.

## VII. *Boyle Elements—Legal Considerations*

The Court considers in further detail the three elements of the government contractor defense under *Boyle, viz:*

(A) whether the government approved reasonably precise specifications;

(B) whether the contractor's equipment conformed to the government's specifications; and

(C) whether the contractor failed to warn of dangers known to it but not to the government.

\*    \*    \*    \*    \*    \*

### (A) *Reasonably Precise Specifications*

*Boyle* established that, to satisfy its first element that there be reasonably precise specifications, only government approval, not government preparation, of the specifications is required. *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518 (contractor must show only that the design was "considered by a Government officer, and not merely by the contractor itself"). Moreover, "reasonably precise specifications" does not, as Plaintiffs contend,

mean that the government must exercise discretion with regard to the *specific* feature alleged to be defective. In *Stout, supra,* 933 F.2d at 334–36, the Fifth Circuit held that, with regard to the first element under *Boyle,* a contractor need only show government approval of the *overall* design. Plaintiffs in *Stout* had argued that specifications for an air conditioning unit were not reasonably precise because they did not specifically prohibit the contractor from installing a safety device. The Fifth Circuit found that the government's thorough review of the overall specifications constituted appropriate approval of reasonably precise specifications. *Id.* at 336. *See also Carley,* 991 F.2d at 1125 ("[T]he government need not deprive the manufacturer of all discretion pertaining to a particular design feature in order for the government contractor defense to apply").

■ Additionally, the Fourth Circuit has held that the first element under *Boyle* may be established if long term governmental use of a product is shown. *Dowd v. Textron Inc.,* 792 F.2d 409, 412 (4th Cir.1986), *cert. denied* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 930 (1988) (government use of product for 20 years prior to plaintiff's injuries; Court held that "[t]he length and breadth of the Army's experience with the [product]—and its decision to continue using it—amply establish government approval of the alleged design defects"). *See also Ramey,* 874 F.2d at 950 (long term government experience with product is one of two ways in which to establish approval of reasonably precise specifications)

(B) *Conformity with Specifications*

■ A contractor's conformity with specifications assures "that the design feature in question was considered by a Government officer, and not merely by the contractor itself." *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518. "[A] product conforms to reasonably precise specifications if it satisfies 'an intended configuration' even if it 'may produce unintended and unwanted results.'" *Kleemann,* 890 F.2d at 703 (quoting *Harduvel v. General Dynamics Corp.,* 878 F.2d 1311, 1317 (11th Cir.1989)), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990). In addition to establishing approval

of reasonably precise specifications, the government's continued use of a product also establishes the second element under the government contractor defense, *viz.,* the contractor's conformity with the specifications. *See Dowd,* 792 F.2d at 412.

(C) *Failure to Warn Government of Known Dangers*

■ The third element a contractor must prove to invoke the government contractor defense is that it warned the government about dangers in the use of the equipment known to it but not the government. *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518–19. Thus the contractor may satisfy this element by proving either (1) that it lacked knowledge of any alleged danger relating to the product, *see, e.g. In Re Aircraft Crash Litigation Frederick, Md.,* 752 F.Supp. 1326, 1367 (S.D.Ohio 1990), *aff'd sub nom, Darling v. Boeing Co.,* 935 F.2d 269 (6th Cir.1991) or (2) that the government already knew of any alleged danger. *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518–19; *Ramey,* 874 F.2d at 951, n. 10 (showing of government knowledge is sufficient to establish third element of *Boyle* ).

■ In support of this component, the contractor may also show that it proposed remedies to perceived defects that the government rejected. *In re Air Crash Disaster at Mannheim, Germany,* 769 F.2d 115 (3d Cir.1985) (third element met where Army reviewed and rejected contractor's proposed improvements relating to alleged defects), *cert. denied sub. nom., Eschler v. Boeing Co.,* 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 891 (1986); *see also Kleemann,* 890 F.2d at 703 (Navy rejected contractor proposal to improve design relating to alleged defect)

VIII. *Application of Law to the Facts*

■ The Court applies the foregoing legal determinations to the facts of this case:

(A) *The Postal Service MPLSM Specifications Were "Reasonably Precise"*

Harold Lieske, former Assistant Director of the USPS Office of Research and Development, has attested that the USPS "developed a comprehensive set of detail production drawings and specifications for the MPLSM,

including key board and speed control specifications." He indicates that he reviewed, approved, and signed every MPLSM drawing, including the "detailed drawing of the keyboard" attached to his affidavit. C. Warren Hurley, former Chief of the Postal Service Laboratory, and Max Okun, a Burroughs Program Manager for a good part of the MPLSM production period, substantiate Lieske's testimony. Thus, contrary to Plaintiff's assertions, the USPS did specify the keyboard design of the MPLSM.

In an effort to suggest that the affidavits of these individuals fail to establish that MPLSM specifications were reasonably precise, Plaintiffs list several purported "defects" identified by their ergonomics expert, comparing them to statements appearing in Defendant's motion and supporting material. Plaintiffs capture no queen by this gambit. Contrary to what Plaintiffs say, USPS specifications addressed precisely those areas identified by Plaintiffs' expert as "defective." Plaintiffs, for example, identify "excessive keying rate demands," "inappropriate key configuration," and "poor key force" as defective keyboard characteristics not addressed by MPLSM specifications. But the specifications in fact dictated *letter sorting rates* (MPLSM "shall have ... normal letter input rates of 45 to 65 letters per minute at each of the operator consoles"), *keyboard configuration* ("Each console will have two keyboards. Both keyboards shall be binary decimal type arranged for two-hand operation having two groups of five keys ...."), and *key pressure* ("Each key lever shall be equipped with an adjusting stud ... to obtain uniform key pressures as indicated on the applicable drawings.")

Similarly Plaintiffs' claims that "knee clearance," console "work surface," "envelope slot height," and "lack of upper body support" were not addressed by the specifications are simply inaccurate. Regarding the operator's chair, for instance, the specifications clearly provided that it "shall be Cramer Posture Chair Model CU–331M–DO without arms, with Ortho–Tilt back, and ... shall have ... special seat height adjustment ... high rest control back."

Any suggestion that Burroughs might have altered the design of the MPLSM to increase the adjustability of the machine also turns a blind eye to the record of this case. In this, as in all other particulars, the contractor enjoyed no discretion whatsoever. On those occasions when Burroughs suggested modifications it felt might reduce operator fatigue and improve operator comfort—including a "heel of hand" rest, an adjustable keyboard, a mechanism to adjust keyboard height, and an asynchronous keyboard console to increase the operator's control over the keying rate—the USPS rejected the proposals.

Plaintiffs' allegation of inadequacies in safety and training manuals fall similarly off the mark. The uncontradicted evidence is that the USPS, not Burroughs, was solely responsible for training MPLSM operators in the proper operation of the machine.

In sum, USPS specifications were beyond peradventure reasonably specific. They were so even under Plaintiffs' restrictive definition of "reasonably precise,"—*i.e.* the specifications in fact addressed the specific problem areas eventually complained of. The Court finds Unisys to have satisfied the first element under *Boyle.*

Necessarily, then, Unisys has also established the first element to defeat plaintiff's failure to warn claim according to the *Tate* test the Court has adopted in these proceedings. Indeed, on the uncontroverted record, Unisys has also satisfied the heightened standard for application of the defense established by the Second, Ninth, and Eleventh Circuits. Despite Plaintiffs' contentions to the contrary, the USPS specifically limited Burroughs to providing only those safety items contained in the MPLSM specifications and drawings. Paragraph 3.11.7.12 of the Postal Service MPLSM specifications could hardly be clearer:

> *Safety Devices*—The [MPLSM] shall be furnished with suitable devices as required by the specifications and as shown on the drawings.... All special safety devices for prevention of damage of letters, for removal of letters deposited on top of or between carts because of improper insertion, and for protection of operators, and

maintenance personnel shall be provided herein, or as shown on the drawings.

Coupled with the requirement that Burroughs not deviate in the "slightest detail" from USPS drawings and specifications, the USPS dictated the precise nature of any safety devices that Burroughs could add to the MPLSM. As the Lieske affidavit establishes, Burroughs could not add "warnings, marking or labels" to the MPLSM without the Postal Service's approval. In sum, by any standard, Defendant has satisfied the first element under *Boyle.*

(B) *Burroughs Conformed to the USPS MPLSM Specifications*

In conjunction with their design defect claim, Plaintiffs do not dispute that the MPLSMs manufactured by Burroughs conformed to the specifications provided by the USPS. Accordingly, Burroughs' conformity for design defect purposes is taken as established. But given the Court's application of the *Tate* test to the failure-to-warn claim, this concession also means that the second element of *Tate* has been satisfied. Not only did Burroughs provide warnings fully in conformity with the USPS specifications; as already set forth, it was precluded from unilaterally adding warnings even if it had wanted to.

(C) *Burroughs Warned the Postal Service of All Dangers Actually Known to It But Not to the Postal Service.*

The third element Unisys must prove under *Boyle* is that Burroughs "warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518.

Nothing in the record of this case suggests that Burroughs actually knew of any danger with the MPLSM's that the USPS did not. From all that appears, whatever Burroughs knew of human factors problems with the MPLSMs was always communicated in timely fashion to the USPS. The fact that the USPS rejected a number of Burroughs pro-

posals to improve the machine's design only serves to underscore this point.

In any event, a contractor has no duty to warn the government of dangers about which the government already is aware. *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518–19; *Ramey,* 874 F.2d at 951 & n. 10 (showing of government knowledge is sufficient to establish the third element of *Boyle* ); *Niemann v. McDonnell Douglas Corp.,* 721 F.Supp. 1019, 1028 n. 8 (S.D.Ill.1989). Here the government's knowledge was both wide and deep. It is undisputed that since the late 1950s, the USPS has appreciated the human factors aspects of MPLSM operations and gained knowledge of operator safety issues at least equal to that of Burroughs. The record is replete with analyses and studies commissioned or received by the USPS addressing such issues. Coupled with the USPS's extensive involvement in MPLSM design and testing and its long term use of the machines, these studies conclusively establish the Service's knowledge in this area. if anything, the government's knowledge may have been superior to that of the contractor. At a minimum, there was sufficient parity of knowledge to satisfy the third element of *Boyle.*

By proving the government's knowledge in the design defect context, Unisys also establishes the third element under *Tate* necessary to defeat Plaintiff's failure to warn claim.

## IX. *Conclusion*

The case needs only a simple summing up. Unisys has successfully invoked the government contractor defense against Plaintiffs both as to their design defect and failure to warn claims. It is entitled to judgment as a matter of law.[2]

---

**2.** As a final matter, the Court notes that repetitive stress injury suits against Unisys based on alleged defects in the MPLSM have been filed in a number of courts. All such cases decided thus

far have resulted in summary judgments in favor of Unisys. *See e.g. Haltiwanger v. Unisys Corp.,* 949 F.Supp. 898 (D.D.C.1996); *Fagans, et al. v. Unisys Corp.,* 945 F.Supp. 3 (D.D.C.1996);

*Houghtaling v. Unisys Corp.*, 955 F.Supp. 309, 1996 WL 794142 (D.N.J.); *Pierce v. Unisys Corp.*, No. 94–2343 (D.N.J. July 12, 1996); *Tassini v. Unisys Corp.*, No. 94–2860 (D.N.J. July 11, 1996); *Crespo v. Unisys Corp.*, No. 94–2339 (D.N.J. June 21, 1996); *Schmid v. Unisys Corp.*, 1996 WL 421843 (E.D.Mo.); *Andrew v. Unisys Corp.*, 936 F.Supp. 821 (W.D.Okla.1996); *Russek v. Unisys Corp.*, 921 F.Supp. 1277 (D.N.J.1996); *Wisner v. Unisys Corp.*, 917 F.Supp. 1501 (D.Kan.1996); and *McCoy v. Unisys Corp.*, No. H–95–1487, 1996 WL 186085 (S.D.Tcx. Jan.16, 1996).