842 A.2d 881 (2004)
367 N.J. Super. 361
Michael S. SILVERSTEIN and Roseanne Silverstein, husband and wife, Plaintiffs-Appellants,
v.
NORTHROP GRUMMAN CORPORATION, a Delaware corporation formerly known as Grumman Corporation, a New York corporation, Grumman Allied Industries, Inc., a New York corporation, General Motors Corporation, a Delaware corporation, Defendants-Respondents, and
Gary W. Stromberg, Charles J. Kowalski, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued February 4, 2004.
Decided March 10, 2004.
*883 Andrew R. Jacobs, Chatham, argued the cause for appellants (Epstein, Fitzsimmons, Brown, Gioia, Jacobs & Sprouls, attorneys; Mr. Jacobs, of counsel; Mr. Jacobs, Ronald Leibman, and Allison Kinnier, on the brief).
James N. Tracy, Point Pleasant, argued the cause for respondent, General Motors Corporation (Tansey, Fanning, Haggerty, Kelly, Convery & Tracy, attorneys; Mr. Tracy, of counsel and on the brief).
Philip W. Crawford, Newark, argued the cause for respondents Northrop Grumman Corporation, Grumman Corporation and Grumman Allied Industries, Inc. (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Mr. Crawford, on the brief).
Before Judges KESTIN, CUFF and WINKELSTEIN.
*882 The opinion of the court was delivered by WINKELSTEIN, J.A.D.
Michael Silverstein (plaintiff), while an employee of the United States Postal Service (USPS), was seriously injured when the postal vehicle he was driving, known as an LLV (Long Life Vehicle), rolled over after being struck by a car.[1] He and his wife, who has asserted a per quod claim, have raised a strict liability claim against the corporate defendants (General Motors (GM) and Grumman) for defective design of the LLV. They assert the vehicle's defective design caused it to roll over when struck by the car. Judge Ciccone granted summary judgment to the corporate defendants, and dismissed plaintiff's complaint against them based on the "government contractor defense," which, when successfully raised, preempts state law claims against federal government contractors. See Boyle v. United Techs. Corp., 487 U.S. 500, 512-14, 108 S.Ct. 2510, 2518-20, 101 L.Ed.2d 442, 458-59 (1988).
In this appeal, we are called upon to decide two issues: first, whether the government contractor defense applies to nonmilitary contracts; and second, if it does, have the corporate defendants established each element of the Boyle test so as to qualify for the defense. We answer both questions in the affirmative. The government contractor defense may be raised by nonmilitary contractors; and here, the corporate defendants have successfully established all of the elements enunciated by the United States Supreme Court in Boyle to qualify for the defense. Accordingly, we affirm.
I. FACTUAL BACKGROUND
A. The Accident
Plaintiff was injured on October 28, 1994, while driving a 1993 LLV, a right-side *884 operated vehicle, on Hamilton Street in Franklin Township. While attempting to make a left turn, plaintiff's vehicle was struck in the rear by another vehicle. The impact caused the LLV to roll onto its right side and slide along the pavement, pinning plaintiff's right arm beneath it. As a result of the injuries plaintiff sustained in the accident, his right arm was amputated.
B. Design and Development of the LLV
In the early 1980's, the USPS decided to seek bids for a new mail delivery truck to replace the Jeep-type vehicle, known as the DJ-5, which the USPS had used for many years. Each DJ-5 was being replaced approximately every eight years, and the USPS wanted a vehicle that could last twenty-four years, which would result in significant cost savings. The new vehicle would be known as the "Long Life Vehicle" or LLV.
Before it drafted the specifications for the LLV, the USPS had gained substantial knowledge about vehicle design and rollover stability through its experience with the DJ-5. That vehicle had been involved in numerous rollover accidents, generating over two dozen lawsuits alleging it was unstable. In fact, the rollover issue was featured on a television news magazine show. As a result, the USPS authorized a study of the vehicle's possible stability problem, from which the USPS concluded that the DJ-5 was not unstable.
The USPS does not design vehicles; rather, it prepares performance specifications and seeks a design from manufacturers based on those specifications. For this reason, when the USPS developed detailed specifications for the LLVs, which it put out to bid on March 20, 1984, it sought written technical proposals from the manufacturers. The specifications contained express dimension requirements for the vehicle, as well as requirements concerning design, safety, ease of maintenance, and fuel economy. The design of the vehicle was required to comply with all federal motor vehicle safety standards. According to Robert St. Francis, the Director of the USPS Office of Fleet Management, whose responsibilities included developing specifications for vehicles and vehicle acquisitions, the USPS was "careful to draft specifications [for the LLV] that would not require any of the [proposed vehicles] to exhibit unstable characteristics," because the USPS was "acutely aware" of stability issues based on its experience with the DJ-5.
The USPS received three proposals in response to the 1984 request. Among them, was a September 1984 joint submission by Grumman and GM. The LLV they proposed had its origins in the GMC S-10 Blazer (Blazer). Their LLV was "expected to have similar stability and handling characteristics as the [Blazer]," but because the "[s]tability of a vehicle is a very complex parameter[, it] ... can only be fully defined when the vehicle is driven." USPS engineers also recognized that the LLV was not expected to handle like a passenger vehicle because, as a sport utility vehicle, it had a higher center of gravity than a typical automobile.
During the proposal phase of the procurement process, the contractors would submit written questions to the USPS contracting officer, and the USPS would supply the technical answers in writing. The technical proposals would then be reviewed by a USPS technical team to determine if they were acceptable.
The bidders were also required to furnish a technical proposal vehicle (TPV) for examination and testing before a contract could be awarded. The TPV was to be a "facsimile of the final version that embodies *885 as many features of the final design as possible."
In 1985, after receiving the proposals but before awarding the contract, a team of USPS personnel, along with independent contractor Booz-Allen & Hamilton, Inc., performed and monitored physical and dynamic (driving) tests on the TPVs based upon "postal test criteria." They tested for total compliance with the specifications. The manufacturers' representatives were also present during testing. Rating the LLV superior to the DJ-5, the primary driver for the USPS team, who had experience both as a professional mechanic and race car driver, concluded that the Grumman LLV was "a magnificent vehicle" and "handled beautifully." Based on Grumman's technical proposal, the USPS Engineering department believed the LLV would be "inherently more stable" than the Blazer because of its lower center of gravity, lighter aluminum body, and wider rear track.
While the USPS tested the LLV prior to awarding the contract, so did Grumman/GM. During this preproduction testing in April 1985, Robert Taylor, a GM development engineer, co-authored a memo listing several incidents of the front wheel of the vehicle lifting off the ground. He considered the condition unacceptable because it meant a lack of proper control of the "front to rear suspension." Taylor suggested the problem could be resolved with changes to the front and rear spring and front and rear stabilizer bar. He recommended obtaining additional data so the LLV design group could "determine the feasibility of incorporating the recommended changes to the existing LLV design." He explained that although the vehicle was not "unstable," the condition nonetheless was one he "would not approve for production as a design." The information concerning the front wheel lift was not shared with the USPS.
Booz-Allen issued its report of the USPS test results in April 1985, concluding that the Grumman TPV "completed the testing ... with no failure of major vehicle components or subsystems." In May, the USPS notified Grumman that its TPV had successfully completed the first step of the solicitation process. According to St. Francis, the other two bidders' vehicles "physically fell apart or were destroyed during the test phase," while Grumman's TPV "passed the test without an incident."
Both the technical proposal and the specifications, which were revised as of March 26, 1986, were incorporated into the contract that the USPS awarded to Grumman/GM in April 1986. The contract called for Grumman/GM to build 99,150 LLVs. The contract price was more than $1.1 billion and the term of the contract was to continue through January 1993, with options to extend. All LLVs were to be constructed in accordance with the 1986 specifications and the contractor's technical proposal. Grumman/GM would present the USPS with a "first article" (the first vehicle off the production line) by September 15, 1986, which the USPS would examine and test, and would either approve or reject. The LLV to be delivered under the terms of the contract was to be "of the same overall design and materials as the Contractor's successful Technical Proposal Vehicle." The specifications called for the LLV to be "ruggedly constructed and highly maneuverable," while the safety characteristics "shall obviate hazards to personnel and property.... [t]otal design shall incorporate the best principles of ruggedness, roadability, safety of operation, ease of handling, cargo loading, and minimum scheduled preventative maintenance servicing."
*886 The contract called for the USPS to be involved with testing the LLV. Particular test conditions were specified, including testing for vehicle stability and handling characteristics. The specifications set forth various "quality assurance provisions," one of which required that a road test of the vehicle be performed by USPS personnel. This test was specifically included in the specifications to allow the USPS to assess the rollover stability of the LLV. The USPS retained the right to reject the vehicle if it was not satisfied with the test results. The specifications stated:

Road TestThe vehicle shall be driven by a USPS representative a sufficient distance to determine its operating and handling characteristics.... The vehicle shall be closely observed for ease of handling and general roadworthiness, i.e., stability, undesirable sway tendency, off-tracking, acceleration, deceleration (including braking).... Evidence of poor handling qualities of roadworthiness characteristics or failure of the vehicle to maintain safety [at various speeds and grades] ... shall be cause for rejection of the vehicle.
The contract also permitted the USPS to perform quality conformance examinations on randomly selected models, to ensure that the quality performance requirements were maintained throughout production.
In April 1987, the USPS notified Grumman/GM that it had approved the test vehicle. Production began, and the first LLVs were put in service that year. The design of the LLV conformed to USPS performance requirements for rollover stability.
On December 22, 1989, an LLV in use in the Chicago area rolled over in an accident. Upon learning of this accident, on January 2, 1990 a USPS employee notified Grumman, raising the issue of the vehicle's stability. Another rollover accident occurred on December 7, 1992, in Florida, involving USPS employee Michael Diaz. When Grumman learned of this accident it did not immediately notify the USPS. Over the term of the contract, however, the USPS tracked accidents involving the LLV and its employees, such as Diaz, as it did with the DJ-5.
Despite the accidents, on at least two occasions the USPS exercised its option to purchase additional LLVs under the contract. Ultimately, the USPS purchased approximately 167,000 LLVs. Grumman also marketed a commercial equivalent of the LLV to the general public, to the postal service in Canada, and to other countries.
II. GOVERNMENT CONTRACTOR DEFENSE
In Boyle, the government contractor defense was applied in the context of a military procurement contract. 487 U.S. at 502, 108 S.Ct. at 2513, 101 L.Ed.2d at 451. David Boyle was a United States Marine helicopter co-pilot who was killed when the helicopter in which he was flying crashed off the coast of Virginia Beach, Virginia during a training exercise. Ibid. He drowned when he was unable to escape from the helicopter. Ibid. His father brought an action claiming that the manufacturer defectively designed the co-pilot's emergency escape system, which ultimately caused Boyle's death. Id. at 503, 108 S.Ct. at 2513, 101 L.Ed.2d at 452.
On appeal from a jury verdict in favor of the plaintiff, the Fourth Circuit reversed, finding the manufacturer was protected from liability under state law based on the "military contractor defense." See Boyle v. United Techs. Corp., 792 F.2d 413, 414 (4th Cir.1986), cert. granted, 479 U.S. 1029, 107 S.Ct. 872, 93 L.Ed.2d 827 (1987). The Supreme Court agreed with the Court of Appeals that the government contractor *887 defense was applicable, but remanded for clarification of the Circuit Court's decision. Boyle, supra, 487 U.S. at 514, 108 S.Ct. at 2519-20, 101 L.Ed.2d at 459.
In arriving at its conclusion, the Court reasoned that the liability of outside contractors performing work for the federal government was an area of uniquely federal interest because the imposition of liability on those contractors would "directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price." Id. at 506-07, 108 S.Ct. at 2515-16, 101 L.Ed.2d at 454. Thus, to safeguard this federal interest, the Court articulated a three-prong test, which, if met, would entitle a government contractor to immunity from state tort law claims. Id. at 512, 108 S.Ct. at 2519, 101 L.Ed.2d at 458. The Court held that a contractor will not be liable in tort under state law to third parties where the contractor proves: "(1) the United States approved the reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Id. at 512, 108 S.Ct. at 2518, 101 L.Ed.2d at 458. When these three elements are present, state tort law "significantly conflicts with federal interests" and is displaced by federal common law. Yeroshefsky v. Unisys Corp., 962 F.Supp. 710, 715 (D.Md.1997).
The Court grounded the scope of the displacement in the discretionary function exemption of the Federal Tort Claims Act (FTCA), 28 U.S.C.A. § 2680(a). Boyle, supra, 487 U.S. at 511, 108 S.Ct. at 2518, 101 L.Ed.2d at 457. This exception renders inapplicable the FTCA's waiver of sovereign immunity to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Carley v. Wheeled Coach, 991 F.2d 1117, 1121 (3d Cir.) (quoting 28 U.S.C. § 2680(a)), cert. denied, 510 U.S. 868, 114 S.Ct. 191, 126 L.Ed.2d 150 (1993). Thus, the government contractor defense applies to "actions requiring the exercise of discretion by `a federal agency or employee of the Government.'" Yeroshefsky, supra, 962 F.Supp. at 716 (quoting 28 U.S.C.A. § 2680(a)). Whether the government exercised discretion is determined by the application of the first two prongs of the three-prong test, which assure that "the design feature in question was considered by a Government officer, and not merely by the contractor itself." Boyle, supra, 487 U.S. at 512, 108 S.Ct. at 2518, 101 L.Ed.2d at 458.
III. APPLICATION OF GOVERNMENT CONTRACTOR DEFENSE TO NONMILITARY CONTRACTS
Prior to Boyle, the federal common-law defense that screened military government contractors from liability in products liability actions existed under what was known as the Feres-Stencel doctrine. See Feres v. United States, 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L. Ed. 152, 161 (1950) (based on distinctly federal character of relationship between the United States Government and members of its armed forces, finding soldier precluded from suing United States for injuries caused by negligence of soldier's superior officers or Government if injuries incident to military service); Stencel Aero Eng'g Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L. Ed.2d 665 (1977) (in military context, extending Feres to indemnity claims). This doctrine had been limited in its application to torts arising out of military service. Carley, supra, 991 F.2d at 1121.
*888 The Boyle Court rejected the Feres-Stencel doctrine as a basis for government contractor immunity; instead, it rested its decision in the discretionary function exception of the FTCA. Boyle, supra, 487 U.S. at 510-11, 108 S.Ct. at 2517-18, 101 L.Ed.2d at 456-57. The majority decision of the Court did not directly comment upon whether the government contractor defense would be applicable in the context of nonmilitary contracts.
In Carley, supra, the Third Circuit was faced with that question. 991 F.2d at 1118. Finding that the same policy concerns were present regardless of whether the contract was military-related, the court concluded that the defense was available to nonmilitary contractors. Ibid. The court said:
Though government contracts for nonmilitary products do not involve considerations of combat effectiveness, all of the other policy reasons cited by the [Boyle] Court in support of the government contractor defense are equally applicable to military and nonmilitary procurements. To determine the design of a nonmilitary product, the government sometimes may engage in complex engineering analysis and may trade off product safety in favor of other technical, economic, or social considerations. If nonmilitary contractors were not protected by a government contractor defense, their increased financial burdens would pass through to the government. Also, allowing state tort actions against nonmilitary contractors who have complied with government contracts would, in effect, empower state authorities to "second-guess" federal policy decisions respecting the design of products for use in civilian projects.
[Id. at 1121-22 (citation and footnote omitted).]
While the federal courts are split over the issue, the majority have agreed with Carley, and have concluded that the government contractor defense extends to nonmilitary contracts. See Yeroshefsky, supra, 962 F.Supp. at 717 (acknowledging split, but expressly following Carley); Wisner v. Unisys Corp., 917 F.Supp. 1501, 1509-10 (D.Kan.1996) (citing Carley); Fagans v. Unisys Corp., 945 F.Supp. 3, 6 n. 3 (D.D.C.1996) (noting Carley); Guillory v. Ree's Contract Serv., 872 F.Supp. 344, 346 (S.D.Miss.1994) (citing Carley); Richland-Lexington Airport Dist. v. Atlas Props., 854 F.Supp. 400, 422 (D.S.C.1994) (citing Carley as the rule in Third, Seventh and Eleventh Circuits); Lamb v. Martin Marietta Energy Sys., 835 F.Supp. 959, 966 (W.D.Ky.1993) (following Carley); Johnson v. Grumman Corp., 806 F.Supp. 212, 217-18 (W.D.Wis.1992) (government contractor defense applied in nonmilitary context involving design of component of the LLV at issue here, but Grumman denied summary judgment based on material issues of fact as to whether government sufficiently reviewed design of component); Haltiwanger v. Unisys Corp., 949 F.Supp. 898, 902 (D.D.C.1996) (applying Boyle standard to claims by postal employees for injuries stemming from operation of postal equipment, but not expressly addressing nonmilitary application of defense). But cf. In re Hawaii Fed. Asbestos Cases, 960 F.2d 806, 812 (9th Cir.1992) (government contractor defense not available to manufacturers of products that were not "specialized items of military equipment," but "goods sold on the ordinary commercial market"); In re Chateaugay Corp., 146 B.R. 339, 351 (Bankr.S.D.N.Y., 1992) (government contractor defense limited to military context); Nielsen v. George Diamond Vogel Paint Co., 892 F.2d 1450, 1453-55 (9th Cir.1990) (court did not read Boyle to extend to nonmilitary products).
*889 Although a minority of courts may differ, we find persuasive the reasoning of the lion's share of the federal courts that the government contractor defense applies to nonmilitary, as well as military contracts. Three significant policy reasons that underlie the defense apply in the context of both military and nonmilitary contracts. First, without having the government contractor defense available, the government may lose the flexibility it needs to trade-off certain safety factors for other economic or technical considerations. Carley, supra, 991 F.2d at 1121-22. Second, nonmilitary contractors may pass their increased financial burdens to the public, or the contractors may not bid for the work. Ibid. And third, "allowing state tort actions against nonmilitary contractors who have complied with government contracts would, in effect, empower state authorities to `second-guess' federal policy decisions respecting the design of products for use in civilian projects." Id. at 1122.
The Boyle Court also rejected the Feres-Stencel rule, which was fashioned upon the distinct federal character of the relationship between the United States and its armed forces. The rejection of this basis for the government contractor defense weighs against limiting the defense solely to military contracts. See Boyle, supra, 487 U.S. at 510-11, 108 S.Ct. at 2517-18, 101 L.Ed.2d at 456-57.
The concept of cloaking a contractor doing business with the federal government with immunity from state tort law is not new in this state. Two New Jersey pre-Boyle cases have recognized that when a government contractor strictly adheres "to the plans and specifications owned and provided by the Government," the contractor should not be held liable in tort for a product design defect. See McDermott v. TENDUN Constructors, 211 N.J.Super. 196, 206, 511 A.2d 690, 695-96 (App.Div.) (contractor, strictly adhering to plans and specifications provided by government, had no discretion, and therefore not liable for defective design of mail conveyor causing death of mail handler), certif. denied, 107 N.J. 43, 526 A.2d 134 (1986); Sanner v. Ford Motor Co., 154 N.J.Super. 407, 409, 381 A.2d 805 (App.Div.1977) (Ford immunized from liability in manufacturing army Jeep vehicle without seatbelts, because it "strictly adhered" to government's plans and specifications), certif. denied, 75 N.J. 616, 384 A.2d 846 (1978).
In support of his argument that the government contractor defense is not available beyond the military context, plaintiff cites to Anzalone v. WesTech Gear Corp., 271 N.J.Super. 522, 638 A.2d 1365 (App.Div.1994), aff'd by an equally divided court, 141 N.J. 256, 661 A.2d 796 (1995), cert. denied, 516 U.S. 1046, 116 S.Ct. 706, 133 L.Ed.2d 662 (1996). Anzalone involved a lawsuit by a civilian naval employee who had a portion of his hand severed by a ram tensionera component of a system used to transfer fuel and supplies between shipswhile aboard a naval tanker. Id. at 524-25, 638 A.2d at 1366. The plaintiff claimed the device was defectively designed because it lacked safety features that could have prevented his injury. Id. at 524, 638 A.2d at 1366. The Law Division granted the manufacturer summary judgment, in part based on the government contractor defense. Ibid. We reversed because the contract contained "no specifications with respect to safety devices." Id. at 535, 638 A.2d at 1372. In other words, we determined that the record did not reflect that the government exercised any discretion concerning the safety of the equipment at issue. Id. at 535-37, 638 A.2d at 1372-73. The alleged defective instrumentality was left solely to the manufacturer's discretion. Id. at 533-34, 638 A.2d at 1371-72.
*890 Here, on the other hand, the record is replete with evidence that the USPS exercised its discretion with regard to the design aspects of the LLV, including the specifications and tests that involved the LLV's stability. The USPS made numerous demands about the size and capacity of the LLV, some of which clearly impacted the vehicle's stability. According to St. Francis, because of the USPS's prior experience with the DJ-5's rollover problems, road test requirements were included in the specifications to allow the USPS, not Grumman or GM, to assess the vehicle's rollover stability. The 24,000-mile test, to be conducted by the USPS, not the contractors, was intended to ensure that handling characteristics, including stability, were consistent with the specifications. Based on the test results, the USPS could approve or reject the test vehicle.
The government's involvement in the design and the stability testing of the LLV distinguishes the case from Anzalone, where the Navy took no part in the design or testing of the safety features of the ram tensioner. Here, the USPS did what we said the Navy omitted to do in Anzalone.[2]
Still additional support for extending Boyle to nonmilitary contracts exists. That may be found in the language of Justice Brennan's prophetic dissent in that case. Concluding that the majority's interpretation of the government contractor defense was "breathtakingly sweeping," the dissent believed it to be applicable:
not only to military equipment ... but... to any made-to-order gadget that the Federal Government might purchase after previewing plansfrom NASA's Challenger Space Shuttle to the Postal Service's old mail cars. The contractor may invoke the defense in suits brought not only by military personnel ... or Government employees, but by anyone injured by a Government contractor's negligent design....
[Boyle, supra, 487 U.S. at 516, 108 S.Ct. at 2520, 101 L.Ed.2d at 460. (Brennan, J., dissenting)].
As one district court judge subsequently noted, "significantly, the Boyle majority left this interpretation unchallenged." Yeroshefsky, supra, 962 F.Supp. at 716.
Accordingly, we conclude that the government contractor defense is available to nonmilitary contractors, such as Grumman and GM in this case.
IV. THREE-PRONG BOYLE TEST
A. Reasonably Precise Specifications
The first prong of the three-prong Boyle test requires that the contractors establish that the government approved reasonably precise specifications. Boyle, supra, 487 U.S. at 512, 108 S.Ct. at 2518, 101 L.Ed.2d at 458. Plaintiff contends that because the specifications did not mention the term "rollover resistance," they were not reasonably precise. Nor, claims plaintiff, did the USPS perform tests adequate to evaluate the LLV's alleged propensity to roll over. These arguments are not persuasive.
In enunciating the first two prongs of the three-part test, the Boyle Court expressed a need to assure that "the suit is within the area where the policy of the `discretionary function' would be frustrated" if the defense were not applied. Ibid. Here, the record contains substantial evidence that the USPS exercised its discretionary functions: by creating the specifications that went into the final design of the LLV; testing the vehicle for stability; *891 and retaining the right to approve the final design and reject any vehicles that did not comply with the specifications.
Simply because the specifications did not contain the words "rollover resistance" does not mean the LLV was either designed or tested without regard to whether the vehicle would roll over. Stability was one of the characteristics that the specifications expressly cited as a concern for the USPSan area to be monitored during road tests. According to St. Francis, the road test provision of the 1986 specifications was included as a result of "allegations of poor stability or rollover resistance" relating to the DJ-5. The specifications provided that as part of the road test, the LLV was to "be closely observed for ease of handling and general roadworthiness, i.e., stability, [and] undesirable sway tendency ... [with] [e]vidence of poor handling qualities of roadworthiness... cause for rejection."
USPS engineers reviewed the proposals for compliance with these specifications, and the USPS reserved the right to reject the LLV if, in its judgment, the LLV did not comply with the rollover stability and other performance requirements. St. Francis said that even if the manufacturer had warranted that the rollover stability of the vehicle was satisfactory, the USPS would still have "had to satisfy ourselves." In fact, the USPS tested the LLV in accordance with those requirements, and no LLV was rejected because it exhibited unsatisfactory stability characteristics.
The USPS does not dispute that it did not design the LLV. St. Francis said "the specifics of items are to be left to the manufacturer who designs the LLV ... as long as the vehicle they provide meets the performance requirements as set forth in the Specifications. " Yet, while the USPS did not design the LLV, at the end of the day, the USPS never relinquished control over whether the design met the USPS's performance requirements, which included vehicle stability.
St. Francis acknowledged that when it developed the specifications, the USPS was aware that the LLV would have "handling and stability" limitations, but those limitations were considered acceptable in that the LLV was a "compromise between handling and utility." Prior to purchase, the USPS "thoroughly evaluated" the vehicle's ride and stability and, while aware of its limitations, deemed them acceptable given the "design task to be a high volume, long life delivery vehicle." As the Third Circuit suggested in Carley, supra, we should not second-guess this type of federal policy decision. 991 F.2d at 1122.
The government "need not deprive the manufacturer of all discretion pertaining to a particular design feature in order for the government contractor defense to apply." Id. at 1125. "[I]t is necessary only that the government approve, rather than create, the specifications...." Ibid. (citing Koutsoubos v. Boeing Vertol, Div. of Boeing Co., 755 F.2d 352, 355 (3d Cir.), cert. denied, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985)); see also Kleemann v. McDonnell Douglas Corp., 890 F.2d 698, 701 (4th Cir.1989) (government participation at various stages of aircraft development establishes military contractor defense), cert. denied, 495 U.S. 953, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990); Harduvel v. Gen. Dynamics Corp., 878 F.2d 1311, 1320-21 (11th Cir.1989) (government reviewed and approved design that incorporated government performance specifications), cert. denied, 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990); Russek v. Unisys Corp., 921 F.Supp. 1277, 1287-88 (D.N.J.1996) (to meet "reasonably precise" requirement of Boyle, specifications for computer keyboards need not "specifically negate every possible modification to the *892 design"); In re Aircraft Crash Litig. Frederick, Md., 752 F.Supp. 1326, 1337 (S.D.Ohio 1990) (where testing of aircraft "produced pursuant to government contract is itself governed by that contract, the rationale of Boyle dictates that the [government contractor defense] be available to claims arising from alleged omissions in the testing process"), aff'd, Darling v. Boeing Co., 935 F.2d 269 (6th Cir. 1991); Maguire v. Hughes Aircraft Corp., 725 F.Supp. 821, 823-24 (D.N.J.1989) (first Boyle prong met by showing government approval of overall design), aff'd, 912 F.2d 67 (3d Cir.1990).
Moreover, where the design process includes on-going dialogue over specifications, which result in the final product, the "approved reasonably precise specifications" requirement is met. Tate v. Boeing Helicopters, 55 F.3d 1150, 1154-55 (6th Cir.1995) (Army and manufacturer engaged in "back and forth development" of Army helicopter); Quiles v. Sikorsky Aircraft, 84 F.Supp.2d 154, 165-66 (D.Mass. 1999) (first Boyle prong established through evidence of "continuous back and forth" review process among Army, Navy, Coast Guard and manufacturer before government gave final approval of helicopter design).
Applying the facts against this legal framework, the first Boyle prong was met. The USPS did not design the LLV, but Grumman/GM incorporated the USPS performance specifications into a design that the USPS reviewed, continuously tested, and ultimately approved. Significantly, the USPS was aware of potential rollover problems through its history with the LLV's predecessor, the DJ-5, and was sensitive to potential rollover issues both when it prepared the LLV's specifications and tested the vehicle. In fact, the specifications that ultimately became the LLV were derived from the DJ-5. The USPS addressed its stability concerns in the specifications; it road tested the vehicle's stability. The specifications called for tests to both the technical proposal vehicle and the first article. Ultimately, the USPS had the right to reject the LLV if its handling characteristics, which included rollover stability, were found by the USPS not to conform to its performance requirements. The USPS's involvement in the design and testing of the LLV more than satisfies the "continuous back and forth" process needed to establish the first Boyle prong.
Plaintiff cites Trevino v. Gen. Dynamics Corp., 865 F.2d 1474 (5th Cir.), cert. denied, 493 U.S. 935, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989), for the proposition that to meet the Boyle test, the government must do more than "rubber stamp" the specifications. The Trevino court said that "[w]hen the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion." Id. at 1480. We do not take issue with that proposition. However, the facts in Trevino are distinguishable from those here.
In Trevino, the defendant designed an interlock for submarines allowing divers to pass in and out of the vessel. Id. at 1476. Five divers died when the interlock failed. Ibid. Because the Navy "never performed nor required a formal design/safety review of the ... diving system prior to the accident[,]" the court concluded that the government failed to perform any discretionary function related to the failed product. Id. at 1477. In contrast to the government's lack of review in Trevino, here, as noted, the USPS approved the specifications and incorporated into the contract standards by which the stability and handling of the LLV could be measured. The *893 USPS's actions regarding the design and testing of the LLV went far beyond what could be considered a rubber stamp.
Yet another route may be taken to ascertain whether the first prong of the Boyle test is satisfied. During the term of the contract, the USPS not only purchased the 99,150 LLVs originally promised, but over time it exercised its option under the contract, purchasing another approximately 68,000 vehicles. This extensive experience with the vehicle, over many years, in the face of the USPS's knowledge that some of the LLV's had been involved in rollover accidents, in itself establishes government approval of the alleged design defect. See Ramey v. Martin-Baker Aircraft Co. Ltd., 874 F.2d 946, 950-51 (4th Cir.1989) (Navy's continued use of F-18 fighter after experience of potential design problems established first and third Boyle prongs); Dowd v. Textron, Inc., 792 F.2d 409, 412 (4th Cir.1986) (Army's continued use of helicopter rotor system established approval of alleged design defect), cert. denied, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 930 (1988).
B. Conformance to the Specifications
Plaintiff primarily rests his argument that the LLV did not conform to the USPS specifications on the report of his engineering expert, Michael Kaplan, who concluded that "the acts of [Grumman/GM] did not conform to the `[s]afety' section of the [s]pecifications or the [t]echnical [p]roposal incorporated by reference therein." That position is simply not supported by the record.
St. Francis testified that the design of the LLV conformed to the USPS's performance requirements for rollover stability. While being driven by experienced USPS personnel, the LLV was extensively tested for ease of handling and general roadworthiness, including stability and sway tendency. During the vehicle's manufacture, the USPS maintained inspectors at the corporate defendants' assembly plant. In fact, the USPS testing was so detailed that Grumman at one point complained that the tests went beyond the scope of the contract. Some vehicles were rejected based on the tests. Annual tests, too, were performed, and according to a USPS engineer, "the [LLVs] consistently demonstrated operational characteristics consistent with the limitations imposed by the USPS contract." Nevertheless, even assuming, without granting, that "no attempt [was made by Grumman/GM] to fully evaluate the LLV's stability" as Kaplan asserts, the specifications reserved the right to the USPS, not Grumman or GM, to make the determination of how much stability evaluation was necessary. And that is what it did.
Furthermore, during its tests, no stability problems were discovered by the USPS. According to a USPS engineer, although there were instances when the quality assurance group recommended vehicle rejection until identified problems were fixed, no LLV was ever rejected because of unsatisfactory stability characteristics.
Plaintiff claims the technical stability analysis comparing the Blazer and the LLV was flawed because the LLV that was actually manufactured "differed in its exact dimensions from that in the Technical Proposal," referring to Kaplan's conclusion that the tested Blazer was "approximately 300 lbs. lighter than the vehicle that was actually manufactured." That argument ignores, however, that the LLV that was ultimately produced was tested and accepted by the USPS. That the USPS was sufficiently satisfied with the final version of the LLV to order an additional 68,000 vehicles over the contract amount, and continued to use the vehicle over many years, supports the conclusion that the LLV was manufactured in accordance *894 with its specifications. See Yeroshefsky, supra, 962 F.Supp. at 719. In short, the record here fully supports that the LLVs conformed to specifications.
C. Warning of Known Danger
We now turn to the third Boyle prong, whether the contractors failed to warn the USPS of rollover dangers known to them but not known to the USPS. The purpose of this prong of the Boyle test is to prevent manufacturers from having an incentive to withhold knowledge of risks. Boyle, supra, 487 U.S. at 512, 108 S.Ct. at 2519, 101 L.Ed.2d at 458.
To support this allegation, plaintiff faults Grumman/GM for not disclosing to the USPS the details of the 1992 Diaz lawsuit, where an LLV was struck by another vehicle and rolled onto its side. This argument lacks merit. As early as 1990, the USPS had been apprised of the LLV rollover accident in Chicago. In fact, even prior to that accident, the USPS had been aware of other accidents involving the LLV. St. Francis said: "[w]e were very... much aware of what was going on with the LLV and were tracking all performance characteristics of it because of previous problems we had had with other vehicles."
To successfully assert the government contractor defense, government contractors are not obligated to warn the government about risks of which the government is already aware. See Ramey, supra, 874 F.2d at 951, n. 10; In re Air Crash Disaster at Mannheim Germany, 769 F.2d 115, 124-25 (3d Cir.1985) (Army had independent knowledge of transmission defect that led to helicopter crash, relieving manufacturer of duty to warn Army of defect), cert. denied, 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 891 (1986). Here, the USPS was already aware of the potential rollover problem before the Diaz lawsuit.
Plaintiff contends that the one wheel lift information, which Grumman/GM developed in its testing, should have been shared with the USPS. Perhaps so. But, the wheel lift incidents took place with regard to the "pre-production, experimental," version of the LLV, not the final version that was ultimately produced; and the USPS tested the LLV and failed to discover a similar problem. A USPS engineer who tested the vehicles by driving them, said that at no time did any of the tested vehicles "exhibit any handling or stability characteristics which raised concerns regarding the trustworthiness of the handling or stability of the product."
Nor does plaintiff's expert explain how, even if the USPS had been given the one wheel lift results, those results would have impacted its overall knowledge of the LLV's rollover propensity, or the LLV's stability in general. Plaintiff offers no support for his allegation that if the USPS had known about "the front-wheel lift off" information, that knowledge "would likely have led to design changes in the LLV...." Taylor testified that the one wheel lift results did not mean the vehicle was unstable, just that it was not an acceptable design. Nor did Kaplan, plaintiff's engineering expert, believe the one wheel lift in and of itself was an indication of instability.
Put somewhat differently, plaintiff points to no material circumstances that Grumman/GM knew of, that the USPS did not, that in any way amounted to a known risk; or, if a known risk existed, that the USPS was not already aware of the risk. See Carley, supra, 991 F.2d at 1127; Ramey, supra, 874 F.2d at 951.
V. PLAINTIFF'S ESTOPPEL CLAIMS
Plaintiff contends that Grumman/GM should be estopped from utilizing *895 the government contractor defense for two reasons. First, because the contractors and the USPS contemplated that the manufacturer would be liable for product liability claims, as evidenced by Grumman's purchase of product liability insurance. Second, because Grumman/GM ultimately marketed the LLV to private parties. These arguments are without sufficient merit to warrant discussion in a full written opinion. R. 2:11-3(e)(1)(E). We add only the following.
The corporate defendants did not objectively manifest in their proposal that they would accept design responsibility. That they may have purchased a measure of product liability insurance is not dispositive on that issue. Moreover, that the corporate defendants sold LLVs to non-USPS buyers after development of the LLV does not bear upon whether the Boyle test has been met, because the vehicle designed pursuant to the USPS specifications was not readily available in substantially similar form on the open market before the development process was completed. See In re Hawaii, supra, 960 F.2d at 811 (policy behind Boyle not applicable where product plaintiff alleged defective was readily available on commercial market and not developed on basis of judgments made by government agency, but rather in response to needs of end-users in private sector); McKay v. Rockwell Int'l Corp., 704 F.2d 444, 451 (9th Cir.1983) (military contractor defense not applicable to "ordinary consumer product purchased by the armed forces"), cert. denied, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984).
VI. SUMMARY
The question whether Grumman/GM established entitlement to the government contractor defense came before the Law Division on summary judgment. In addressing such a motion, the court must consider, in a light most favorable to the nonmoving party, whether the materials presented create genuine issues of material fact. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146, 156 (1995).
Here, for the reasons we have stated, we agree with Judge Ciccone that plaintiff has failed to establish any genuine issues of material fact that would require resolution by a jury. We conclude that the government contractor defense applies to nonmilitary contracts, and the corporate defendants have established, as a matter of law, that the defense applies under the facts of this case.
Affirmed.
NOTES
[1] Claims against the owner and driver of the other vehicle have been dismissed and are not subject to this appeal.
[2] For additional examples of the USPS's involvement with the specifications and testing of the LLV, please refer to our discussion of whether the USPS approved "reasonably precise specifications," infra, at IV(A).